146 P.3d 103

Myles TAMASHIRO, Warren Toyama, Heather Farmer, Filo Tu, Jeanette Tu, Lynn Misaki, Clyde Ota, Miriam Onomura, and Yoshiko Nishimura, Plaintiffs–Appellees/Cross–Appellants,

v.

DEPARTMENT OF HUMAN SERVICES, State Of Hawai'i; Stephen Teeter, in his capacity as Business Manager for Ho'Opono, Joe Cordova, in his capacity as Administrator of the Division of Vocational Rehabilitation, State of Hawai'i, Department of Human Services; Dave Eveland, in his capacity as Administrator of the Services to the Blind Branch of the State of Hawai'i, Department of Human Services; and Lillian B. Koller, in her capacity as Director of the State of Hawai'i, Department of Human Services,[1] Defendants–Appellants/Cross–Appellees,

and

City and County of Honolulu, Defendant.

No. 24552.

Supreme Court of Hawai'i.

Oct. 27, 2006.

---

1. Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c) (2004), Stephen Teeter, Joe Cordova, and Lillian B. Koller were substituted as parties to the instant appeal.

Dorothy Sellers, Deputy Attorney General, on the briefs, for defendants-appellants/cross-appellees.

Evan R. Shirley, Honolulu, Gregory A. Ferren, Stanley E. Levin, Honolulu, and Ann Williams, on the briefs, for plaintiffs-appellees/cross-appellants.

MOON, C.J., NAKAYAMA, J., and Circuit Judge WATANABE, in place of DUFFY, J., recused; Circuit Judge POLLACK, in place of LEVINSON, J., recused, dissenting, with whom ACOBA, J., joins.

### Opinion of the Court by MOON, C.J.

This case arises from the alleged failure of defendants-appellants/cross-appellees Department of Human Services (DHS), State of Hawai'i (the State), Lillian B. Koller, Joe Cordova, Dave Eveland, and Stephen Teeter[2] [hereinafter, collectively, the State defendants] to enforce Hawai'i Revised Statutes (HRS) §§ 102–14 (Supp.2005) and 347–12.5 (1993), quoted *infra*, and the implementing regulation, Hawai'i Administrative Rules (HAR) § 17–402–17, quoted *infra*, [hereinafter, collectively, the Hawai'i Randolph–Sheppard Act (the Hawai'i RSA)] as against defendant City and County of Honolulu (the City). Briefly stated, the Hawai'i RSA is modeled after the federal Randolph–Sheppard Vending Stand Act, discussed *infra*, which grants priority to blind and visually handicapped individuals who desire to oper-

ate vending facilities on federal property. The Hawai'i RSA applies to state and county properties. The City allegedly (1) did not give priority to visually handicapped individuals licensed by DHS to operate vending facilities [hereinafter, the blind vendors] in its public buildings and (2) did not transfer to the State defendants the commissions collected from the City's own vending machine operation, both of which were allegedly in contravention of the Hawai'i RSA.

Plaintiffs-appellees/cross-appellants Myles Tamashiro, Warren Toyama, Heather Farmer, Filo Tu, Jeanette Tu, Lynn Misaki, Clyde Ota, Miriam Onomura, and Yoshiko Nishihara [hereinafter, collectively, the plaintiffs], who are licensed blind vendors, sought declaratory, monetary, and equitable relief (including injunctive relief) against the State defendants and the City[3] for their alleged failure to, respectively, enforce and comply with the requirements of the Hawai'i RSA. The plaintiffs maintained that the State defendants were required to ensure that: (1) vending machine income generated from state and county operations be paid into the Randolph–Sheppard Revolving Account [hereinafter, the RSR Account]; and (2) those funds were reserved for the use and benefit of the State's blind vendors.

The State defendants appealed, and the plaintiffs cross appealed, from the August 22, 2001 final judgment of the Circuit Court of the First Circuit, the Honorable Eden E. Hifo presiding, finding in favor of the plaintiffs and against the State defendants. The trial court awarded the plaintiffs, *inter alia*, money damages in the amount of approximately $3.67 million.

The State defendants, on appeal, and the plaintiffs, on their cross appeal, challenged various pre-trial and post-judgment rulings made by the trial court. However, inasmuch as we hold that subject matter jurisdiction is lacking, we need not address the parties'

---

**2.** The named individuals are sued in their official capacities of employment with the State. Lillian B. Koller is the Director of DHS; Joe Cordova is the Administrator of DHS's Division of Vocational Rehabilitation; Dave Eveland is the Administrator of DHS's Services to the Blind Branch; and Stephen Teeter is the Business Manager for

the Blind in the branch of DHS known as "Ho'opono." *See supra* note 1.

**3.** As discussed *infra*, the plaintiffs settled with the City; therefore, the City is not a party to the instant appeal.

challenge to these various pretrial and post-judgment rulings. Accordingly, we reverse the circuit court's August 22, 2001 final judgment.

## I. BACKGROUND

### A. Legal Background

#### 1. The Randolph–Sheppard Vending Stand Act

Congress enacted the Randolph–Sheppard Vending Stand Act [hereinafter, the federal RSA] in 1936, amending the federal RSA twice, in 1954 and 1974. Pub.L. No. 74–732, §§ 1–7, 49 Stat. 1559, 1559–60 (1936); Pub.L. No. 83–565, § 13, 68 Stat. 652, 663–65 (1954); Pub.L. No. 93–516, §§ 200–11, 88 Stat. 1617, 1622–31 (1974); see also Pub.L. No. 93–651, §§ 200–11, 89 Stat. 2–3, 2–7 to 2–16 (1974) (codified as amended at 20 U.S.C. §§ 107 to 107f (2000)). The federal RSA establishes a cooperative federal-state program [hereinafter, the federal RSA program or the program] that "provid[es] blind persons with remunerative employment, enlarg[es] the economic opportunities of the blind, and stimulat[es] the blind to greater efforts in striving to make themselves self-supporting" by authorizing licensed blind persons "to operate vending facilities on any [f]ederal property" and granting them "priority" in such operation. 20 U.S.C. § 107(a)-(b).

Under the federal RSA, states can gain access to federal properties in their respective states to operate blind vending facilities by having one of its state agencies apply to the United States Department of Education (USDOE) to be designated as a "state licensing agency" (SLA), and, as discussed more fully infra, states must agree to a number of conditions. See New Hampshire v. Ramsey, 366 F.3d 1, 6 (1st Cir.2004) ("States' participation in the program is voluntary."). The SLAs, in turn, license blind persons to operate vending facilities and match them with available contracts on federal property. 20 U.S.C. § 107b.

Examination of the evolution of this unique federal statutory scheme reveals that the original federal RSA was designed to create employment opportunities for the blind on federal property and for further federal rehabilitative efforts on behalf of the blind. H.R.Rep. No. 1094, 74th Cong., 1st Sess. 1, 2 (1936). As originally designed, no priority or preference was given to blind vendors to operate vending facilities on federal property. Id.; see also Pub.L. No. 74–732, §§ 1–7, 49 Stat. at 1559–60. The 1954 amendment, however, strengthened the federal RSA by, inter alia: (1) authorizing a preference, where feasible, to blind vendors to set up vending stands on federal property, Pub.L. No. 83–565, § 4, 68 Stat. at 663; see also 20 U.S.C. § 107a(b) (providing that SLAs "give preference to blind persons who are in need of employment"); and (2) requiring that participating states (i.e., SLAs) agree "to provide any blind licensee dissatisfied with any action arising from the operation or administration of the vending stand program an opportunity for a fair hearing," Pub.L. No. 83–565, § 4, 68 Stat. at 664. The 1954 amendment did not, however, specify the nature of the hearing or the relief which should be afforded as a result of such a hearing.

In 1969, Congress proposed additional amendments

> because of the weak showing in the number of blind vendors operating on federal property, the growing trend toward installation of vending machines and the exclusive use of machines in some federal buildings, as well as increasing use of vending machine income by federal employees for recreation and welfare purposes. S. 2461 was designed to protect the blind preference established in the 1954 amendment[ ].

S.Rep. No. 1235, 91st Cong., 2d Sess. 2 (1970).

Texas State Comm'n for the Blind v. United States, 6 Cl.Ct. 730, 732 (1984) (footnote omitted), rev'd on other grounds, 796 F.2d 400 (Fed.Cir.1986) (en banc), cert. denied, 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987). Although hearings on Senate Bill No. 2461 were held in both the Senate and the House of Representatives, the 91st Congress adjourned without considering it further. See Delaware Dep't of Health & Soc. Servs. v. United States Dep't of Educ., 772 F.2d 1123, 1127 (3d Cir.1985). In September 1971, a similar bill, Senate Bill No. 2506, was

introduced in the 92d Congress. *Id.* However-er,

> Congress requested the General Accounting Office (GAO) to review vending operations on federally-controlled property and to determine if blind vendors were receiving preference as required by the 1954 amendment[ ]. . . .
>
> The report concluded that the program was languishing at the federal level while flourishing at the state level and in the private sector. GAO found that not only has little attention been paid to the blind vendor program, but that major abuses had occurred[, *e.g.*, the parent Defense Department association at a major federal space installation demanded blind vendors give a portion of their income to the association; and the Department of Defense regulations, 32 C.F.R. § 260.4(b)(3)(ii) (1966), provided that no permits would be granted to blind vendors for the operation of vending stands if morale and welfare programs would be placed in jeopardy].

*Texas State Comm'n for the Blind*, 6 Cl.Ct. at 732–33 (footnote omitted). Consequently, another bill, Senate Bill No. 2581, which reflected some of the findings contained in the GAO's report, was introduced. *Delaware Dep't of Health & Soc. Servs.*, 772 F.2d at 1127 (citing S. 2581, 93d Cong., 1st Sess. (1973)). Eventually, House Resolution No. 14225, substantially similar to Senate Bill No. 2581, was passed and became law on November 21, 1974. *Id.* (citing Pub.L. No. 93–651, 89 Stat. 2–3 (1974) [4]).

The 1974 amendment expanded the statute to increase the fair treatment of blind vendors and to provide oversight of the federal RSA's application in the federal government, among other objectives. S.Rep. No. 937, 93rd Cong., 2d Sess. 9 (1974), *reprinted in,* 1974 U.S.C.C.A.N. 6417 [hereinafter, S.Rep. No. 93–937]; *see also* Pub.L. No. 93–561,

§§ 200–11, 89 Stat. 2–3, 2–7 to 2–16 (1974). The 1974 amendment, in part, resulted in giving blind vendors *priority* (as opposed to preference) to operate vending facilities on federal property. 20 U.S.C. § 107(b). Thus, in sum and as more succinctly described by the United States Court of Appeals for the Sixth Circuit in *Tennessee Department of Human Services v. United States Department of Education,* 979 F.2d 1162 (6th Cir. 1992):

> The [federal RSA] grants priority to those blind persons who desire to operate vending facilities on federal property. 20 U.S.C. § 107(b). The [federal RSA] divides responsibility for the blind vendor program between the state and federal agencies. The Secretary of Education [[hereinafter, the Secretary]], is responsible for interpreting and enforcing the [federal RSA's] provisions, and more specifically, for designating [SLAs]. 20 U.S.C. § 107a(a)(5), [§ ]107b; 34 C.F.R. §§ 395.5, 395.8. A person seeking a position as a blind vendor applies to the designated state agency and is licensed by that agency. The state agency in turn applies to the federal government for the placement of the licensee on federal property. 20 U.S.C. § 107b. Once the state and the federal government have agreed on an appropriate location for the vending facility, the [SLA] is responsible for equipping the facility and furnishing the initial stock and inventory. 20 U.S.C. § 107b(2). The blind vendor thereafter operates as a sole proprietor who is entitled to the profits of the vending facility and who is responsible for the facility's losses.

*Id.* at 1163–64.

The 1974 amendment also revised the remedial scheme for aggrieved blind vendors. *See* Pub.L. No. 93–561, §§ 204, 206, 89 Stat.

---

**4.** In the 1974 amendment, Congress specifically made the following findings:

> (1) [A]fter review of the operation of the blind vending stand program authorized under the [RSA] of June 20, 1936, that the program has not developed, and had not been sustained, in the manner and spirit in which the Congress intended at the time of its enactment, and that, in fact, the growth of the program has been inhibited by a number of external forces; [and]

> (2) ... *[T]he potential exists for doubling the number of blind operators on Federal and other property* under the Randolph–Sheppard program within the next five years, provided the obstacles to growth are removed, that legislative and administrative means exist to remove such obstacles, and that Congress should adopt legislation to that end[.]

Pub.L. No. 93–651, § 201, 89 Stat. at 2–7 (emphasis added).

at 2–10 to 2–11, codified at 20 U.S.C. §§ 107b(6) and 107d–1; S.Rep. No. 93–937. At that time, in addition to the 1954–requirement that participating states provide dissatisfied blind licensees "an opportunity for a fair hearing," Pub.L. No. 83–565, § 4, 68 Stat. at 664, codified at 20 U.S.C. § 107b(6), Congress imposed the additional requirement that participating states *"agree to submit the grievances of any blind licensee not otherwise resolved by [the fair] hearing to arbitration* as provided in section 5 of this Act [20 U.S.C. § 107d–1]." Pub.L. No. 93–651, § 204, 89 Stat. at 2–10, codified at 20 U.S.C. § 107b(6) (emphasis added). The term "fair hearing" was defined as "a full evidentiary hearing" in section 5(a) of the 1974 amendment, which states:

> Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a[SLA] a request for *a full evidentiary hearing,* which shall be provided by such agency in accordance with section 3(6) of this Act [*i.e.,* 20 U.S.C. § 107b(6) ].

Pub.L. No. 93–651, § 206, 89 Stat. at 2–11, codified at 20 U.S.C. § 107d–1(a) (emphasis added). Additionally, Section 5(a) provides that:

> If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may *file a complaint with the Secretary who shall convene a panel to arbitrate the dispute* pursuant to section 6 of this Act [*i.e.,* 20 U.S.C. § 107d–2], and the decision of such panel shall be final and binding on the parties except as otherwise provided in this Act.

*Id.* (emphasis added). Section 6(a) of the 1974 amendment provides in relevant part:

> Such [arbitration] panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct

a hearing, and render its decision *which shall be subject to appeal and review as such final agency action for purposes of chapter 7 of Title 5.*

*Id.,* codified at 20 U.S.C. § 107d–2(a) (emphasis added). The reference to chapters 5 and 7 of Title 5 are to the administrative procedures and judicial review provisions of the Administrative Procedure Act (APA).[5]

Thus, in sum, the remedial scheme mandated by the 1974 amendment include: (1) a full evidentiary hearing at the state level before the SLA; (2) an opportunity to appeal the SLA decision to the USDOE for review by an arbitration panel; and, finally, (3) judicial review of the USDOE's arbitration panel decision in the federal courts [hereinafter, collectively, the federal adjudication path]. Pub.L. No. 93–561, §§ 204, 206, 89 Stat. at 2–10 to 2–11, codified at 20 U.S.C. §§ 107b(6), 107d–1, and 107d–2(a).

### 2. The Hawai'i Randolph–Sheppard Act

As previously stated, the Hawai'i RSA, consisting of HRS §§ 102–14 and 347–12 and their implementing regulation, HAR § 17–402–17, is modeled after the federal RSA and applies to state and county properties.[6] HRS § 102–14 provides in relevant part:

> **§ 102–14 Use of public buildings by blind or visually handicapped persons.** (a) For the purpose of providing blind or visually handicapped persons, as defined in sections 235–1, 347–1, and 347–2[,] with remunerative employment, enlarging their economic opportunities and stimulating them to greater efforts in striving to make themselves self-supporting, blind or visually handicapped persons registered by [DHS] under section 347–6 and issued permits under subsection (c) shall be authorized to operate vending facilities and machines in any state or county public building[.]

---

**5.** Section 706 of 5 U.S.C. permits the reviewing court to set aside agency adjudicative actions which are, *inter alia,* "arbitrary, capricious, an abuse of discretion or otherwise not in accordance to law," or "unsupported by substantial evidence."

**6.** The Hawai'i RSA was originally enacted in 1937. 1937 Haw. Sess. L. Act 208, § 1. Prior to a 1981 amendment, the Hawai'i RSA, like the federal RSA, gave blind vendors a "preference" regarding the operation of vending facilities on state and county properties. In 1981, the statute was amended consistent with its federal counterpart to provide blind vendors "priority" status.

(b) [DHS], after consultation with authorities responsible for management of state or county public buildings, shall adopt rules in accordance with [C]hapter 91, necessary for the implementation of this section, including, but not limited to rules to assure that priority be given to registered blind or visually handicapped persons in the operation of vending facilities in state or county public buildings and to establish, whenever feasible, one or more vending facilities in all state and county public buildings.

(c) Assignments of vending facilities and space for vending machines shall be by permit issued by [DHS].

(d) No person shall advertise or otherwise solicit the sale of food or beverages for human consumption in any public building which is in competition with a vending facility or machines operated or maintained by a duly authorized blind or visually handicapped person. . . .

(e) After July 1, 1981, or upon the expiration of vending machine contracts in existence on June 10, 1981, no vending machines shall be placed in any state or county public building in which there is a vending facility or machine assigned by permit to a blind or visually handicapped person except pursuant to a permit issued by [DHS].

(Bold emphasis in original.) HRS § 347–12.5 states:

[§ 347–12.5] **Randolph–Sheppard revolving account.** (a) There is established within the state treasury the [RSR] [A]ccount. The revolving account shall be used by [DHS] for:

(1) The provision of the following benefits for blind vendors:

(A) A retirement or pension plan;

(B) Health insurance; and

(C) Sick and vacation leave;

(2) The maintenance and replacement of equipment used in the blind vending program;

(3) The purchase of new equipment to be used in the blind vending program; and

(4) The provision of management services, which shall include, but not be limited to:

(A) The hiring of consultants;

(B) The sponsoring of training seminars;

(C) Transportation;

(D) Per diem for vendors to attend meetings of the state committee of blind vendors;

(E) Services for the state committee of blind vendors; and

(F) Other costs related to the blind vending program.

(b) Income from vending machines on federal, state, and county properties that are within reasonable proximity to, and in direct competition with, a blind vendor may be deposited into the account and then disbursed to the blind vendor.

(c) The revolving account shall consist of funds derived from:

(1) Vending machine income generated by federal, state, and county operations;

(2) Any other legally accepted source of income; and

(3) Donations.

(Bolded text in original.) HAR § 17–402–17(j) provides:

(j) Evidentiary hearings and arbitration of vendor complaints shall be provided for in the following manner:

(1) Each vendor shall have the right and opportunity to assert [a] claim and to secure, in an informal administrative proceeding, review of a grievance or dissatisfaction with a decision made or action taken. This shall be in accordance with the State's vocational rehabilitation rules and standards.

(2) Each vendor or a personal representative or next of kin shall be given an opportunity for a full and fair hearing if [the] vendor is dissatisfied with any action arising from the operation or administration of the vending facility program. Such requests for a hearing shall be submitted in writing to the director.

(3) A vendor shall have the right to be represented at the hearing by counsel or other representative.

(4) The hearing shall be held in a place and time convenient to the vendor, personal representative or next of kin. There shall be notice to the vendor at least two weeks in advance, giving the date, time, and place of hearing.

(5) The vendor shall have an adequate opportunity to present the case and to be cross-examined.

(6) The hearing shall be held before the director or a designated agent. Authority to make the final decision based upon the record of the hearing shall be exercised by the department.

(7) The verbatim transcript of testimony and exhibits, or an official report containing the substance of what transpired at the hearing, together with all papers and reports filed in the proceedings, and the hearing officer's recommendation, shall constitute the exclusive record for decision and shall be made available to the vendor at any reasonable time.

(8) The decision shall set forth the issue, principle, and relevant facts brought out at the hearing, the pertinent provisions in law, agency policy and the reasoning that led to the decision. The individual shall be forwarded a copy of the section or shall be advised in writing of the content.

(9) The vendor shall be informed of the right to request the [Secretary] to convene an ad hoc arbitration panel, if the vendor is dissatisfied with any action taken or decision rendered as a result of the full evidentiary hearing. [7]

7. The current version of HAR § 17–402–17 (which recognizes the federal adjudication path) was adopted in 1981. The 1981 amendment replaced section 5, entitled "Fair Hearing," of Rule 9 of the "Department of Social Services Rules and Regulations for Vending Stand Program for the Blind on Federal and Other Property" that was originally promulgated in 1971. As originally promulgated, section 5 provided in relevant part:

> 5.1. Each operator or his personal representative or next of kin shall be given an opportunity for a *full and fair hearing* if he is dissatisfied with any action arising from the operation or administration of the Business

(Bold emphasis in original.) (Underscored emphases added.)

Consequently, in Hawai'i, blind persons enjoy not only the benefits provided by the federal RSA, but also analogous benefits conferred by state law. In essence, the Hawai'i RSA affords blind persons vending opportunities on state and county properties similar to the opportunities afforded by its federal counterpart, 20 U.S.C. §§ 107 to 107f, with respect to federal properties, *see* HRS § 102–14(b), and provides a grievance procedure for vendor complaints, discussed *infra.* HAR § 17–402–12(j)(2) through (9). The Hawai'i RSA further establishes the RSR Account, in which income generated from vending machines on federal, state, and county properties within the state of Hawai'i that "are within reasonable proximity to, and in direct competition with, a blind vendor may be deposited" and "disbursed to the blind vendor." HRS § 347–12.5(b).

### B. *Factual and Procedural Background*

The following undisputed facts and procedural history are relevant to our resolution of this appeal.

#### 1. Events Leading to Litigation

Sometime in or around March 1995, it came to the attention of the plaintiffs that the City was not making space in its public buildings for vending machines under the control of blind vendors, in violation of the Hawai'i RSA. Instead, the City had placed its own leased machines in such locations and kept the proceeds for its own use. DHS, serving as Hawaii's SLA,[8] sent written re-

> Enterprise Program [ (now known as the Vending Facility Program) ]....

(Emphasis added.) Inasmuch as the mandate to adhere to the federal adjudication path was not established until 1974, *see* Pub.L. No. 93–651, §§ 204, 206, 89 Stat. at 2–10, 2–11, section 5 of Rule 9 did not, obviously, contain any reference to it.

8. As previously indicated in *supra* note 7, the adoption of the federal adjudication path within HAR § 17–402–17(j) was made in 1981 after the federal RSA was amended to include such requirement. DHS, thereafter, applied to the USDOE to become an SLA on February 25, 1982. Its application contained, *inter alia,* the signature

quests to county property managers to place blind vendor vending machines in county buildings on several occasions, but such requests were ignored, and DHS did nothing further.

Between mid–1995 to early 1996, plaintiffs and/or representatives on their behalf attempted to secure the City's voluntary compliance with the law by (1) making space available in its public buildings for blind vendor machines or (2) paying the State defendants, specifically, DHS, on behalf of the blind vendors, all the monies collected from the alleged unauthorized and illegal vending machines it controlled in its public buildings, but to no avail.

Eventually, on February 13, 1996, the Hawai'i State Committee for Blind Vendors, on behalf of blind vendors, including the plaintiffs, filed with DHS a request for a declaratory ruling "as to whether HRS § 102–14 and its implementing regulations authorize [DHS] to place [vending] machines in buildings where the agency head or building manager objects." DHS did not respond.

### 2. Circuit Court Proceedings

On July 22, 1996, the plaintiffs filed the instant action against the State defendants and the City for their alleged failure to enforce and comply with the requirements of the Hawai'i RSA. On August 19, 1996, the State defendants filed their motion to dismiss the complaint or, in the alternative, to stay proceedings pending the disposition of the declaratory ruling from the DHS. On August 29, 1996, the City joined the State defendants' motion to dismiss. On November 7,

1996, the circuit court stayed the action to allow for administrative handling of the request for a declaratory ruling.

Thereafter, on June 6, 1997, then-DHS Director Susan Chandler, apparently without conducting a full evidentiary hearing, issued a decision and order, basically agreeing with the long-asserted position of the plaintiffs that, "[p]ursuant to sections 102–14 and 347–12.5, together with the implementing regulations, [DHS] has authority to control both the placement of vending machines in all state and county public buildings and the income derived therefrom." In other words, DHS has the authority to lawfully place vending machines on City property without the assent of the City.[9]

In June 1999, the plaintiffs entered a settlement with the City.[10] On July 15, 1999, the circuit court approved the settlement and granted the parties' request to maintain the action as a class action.

On August 2, 2000, a jury-waived trial commenced to determine two main issues: (1) the extent of loss and the amount of damages; and (2) declaratory and equitable relief. The trial lasted four days from August 2 through 4 and 8, 2000. On September 27, 2000, the trial court, *inter alia,* entered judgment in favor of the plaintiffs in the amount of $3,676,922.

### 3. The First Appeals

The State defendants and the plaintiffs both appealed the September 27, 2000 judgment, which appeals were docketed as appeal Nos. 23843 and 23997, respectively. This

---

of then-director of DHS, Franklin Y.K. Sunn, and the chief executive of the State, George R. Ariyoshi, along with an attachment of the rules and regulations, as amended, for the USDOE's approval. On April 15, 1982, the USDOE approved DHS's application for "redesignation as the [SLA] under the [federal RSA] as amended."

9. Although not relevant to the instant appeal, the City, on July 9, 1997, filed a Notice of Appeal to the First Circuit Court, pursuant to HRS § 91–14 (1993), appealing the June 6, 1997 decision and order of Director Chandler. The case was captioned *City and County of Honolulu v. Susan Chandler,* Civil No. 97–2827–07. Shortly after, the County of Hawai'i filed a separate administrative appeal of the June 6, 1997 decision in the

Third Circuit Court, styled *County of Hawai'i v. Susan Chandler,* Civil No. 97–3201. Upon the request of DHS, the two administrative appeals were consolidated. Upon the request of the plaintiffs, the consolidated administrative appeal was ultimately consolidated with the plaintiffs' case on October 21, 1997.

10. The City, *inter alia,* agreed to (1) remove and replace all non-blind vendor vending machines on its properties, (2) pay the amount of $150,000, and (3) dismiss its administrative appeal. Additionally, the parties agreed to obtain a commitment from the County of Hawai'i to dismiss its administrative appeal. On October 12, 1999, both administrative appeals were dismissed.

court, however, dismissed both appeals on February 5, 2001 and March 14, 2001, respectively, for lack of appellate jurisdiction because no dismissal or judgment of the plaintiffs' claims against the City had been filed.

### 4. Post–First Appeal Proceedings

On February 6, 2001, after their initial appeal had been dismissed, the State defendants filed a motion to dismiss at the trial level, asserting for the first time that the circuit court lacked subject matter jurisdiction. The State defendants argued that: (1) the terms and conditions of the State's consent to be sued define and restrict the court's jurisdiction; and (2) the court has no jurisdiction because the terms and conditions of the consent to suit require plaintiffs to pursue a full and fair evidentiary hearing, followed, if necessary, by arbitration under the auspices of the federal Secretary of Education, followed, if necessary, by an appeal, pursuant the federal APA, as mandated by HAR § 17–402–17(j). The plaintiffs, on the other hand, argued, *inter alia*, that this court, in *Hawai'i Blind Vendors Association v. Department of Human Services*, 71 Haw. 367, 791 P.2d 1261 (1990), had already determined that "concurrent original jurisdiction" vested authority in both the court and the agency, *i.e.*, DHS. *Id.* at 371, 791 P.2d at 1264. The plaintiffs, therefore, asserted that "there is no question that the court has subject matter jurisdiction."

A hearing on the motion to dismiss was held on March 27, 2001. At the hearing, the State defendants again argued that they "had to waive[ their] immunity the way the federal government told [them to in order] to be a participating state licensing agency and to receive federal money," *i.e.*, by adopting

the federal adjudication path in the HAR. The plaintiffs essentially contended that "the grievance procedures in the [federal RSA] were not intended to and do not control how [the] State administers [its] own State laws relating to vending facilities on state and county properties." On April 18, 2001, the circuit court denied the motion, ruling that the prior order denying the State defendants' motion for summary judgment on sovereign immunity grounds.[11] is the law of this case "unless there exist cogent reasons to defer from it, and this [c]ourt does not find any such cogent reasons exist."

On August 22, 2001, the circuit court entered a final judgment. The August 22, 2001 final judgment essentially provides that: (1) as between the plaintiffs and the City, the July 15, 1999 order was entered in favor of the plaintiff and against the City in accord with the settlement agreement between them; (2) as between the plaintiff and the State defendants, judgment as to liability was entered in favor of the plaintiffs on March 14, 2000; and (3) the remaining non-liability issues were tried to the court in August 2000, in which the court entered its FOFs and COLs on September 27, 2000, adjudging that (a) the plaintiffs would be awarded $3,676,922.00 and (b) "declaratory and other equitable relief shall be entered." Consequently, "[a]ll claims as to all parties have been adjudicated." The circuit court also entered a separate Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (2005)[12] judgment concerning the plaintiffs' previously undismissed claims against the City.

Thereafter, on September 19, 2001, the State defendants appealed from the August 22, 2001 judgment. On September 20, 2001,

---

11. On January 6, 2000, the State defendants had moved for summary judgment on the ground that they are immune from suit under the doctrine of sovereign immunity, which was denied by the court, the Honorable Linda K.C. Luke presiding, on January 25, 2000.

12. HRCP Rule 54 provides in relevant part:

(b) *Judgment upon multiple claims or involving multiple parties.* When more than one claim for relief is presented in an action … or when multiple parties are involved, the court may direct the entry of final judgment as to

one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any … form of decision … which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties[.]

(Emphasis in original.)

398

the plaintiffs cross-appealed from the final judgment.

## II. STANDARDS OF REVIEW

### A. Subject Matter Jurisdiction

 The circuit court's authority to hear the instant matter and, in turn, this court's authority to review the circuit court's rulings are questions of subject matter jurisdiction. "Whether a court possesses subject matter jurisdiction is a question of law reviewable *de novo.*" *Hawai'i Mgmt. Alliance Ass'n v. Ins. Comm'r,* 106 Hawai'i 21, 26, 100 P.3d 952, 957 (2004) (internal quotation marks and citation omitted); *see also Int'l Bhd. of Painters & Allied Trades, Local Union 1944 v. Befitel,* 104 Hawai'i 275, 281, 88 P.3d 647, 653 (2004) ("Subject matter jurisdiction is concerned with whether the court has the power to hear a case." (Internal quotation marks and citation omitted.)). We further note that:

> The lack of jurisdiction over the subject matter cannot be waived by the parties. If the parties do not raise the issue, a court *sua sponte* will, for unless jurisdiction of the court over the subject matter exists, any judgment rendered is invalid.

*Chun v. Employees' Ret. Sys. of the State of Hawai'i,* 73 Haw. 9, 14, 828 P.2d 260, 263 (1992) (citation and internal quotation marks omitted). When reviewing a case to determine whether the circuit court has jurisdiction, we "retain[ ] jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction." *Amantiad v. Odum,* 90 Hawai'i 152, 159, 977 P.2d 160, 167 (1999) (citation omitted).

### B. Statutory Interpretation

 "The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews *de novo.* Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *Liberty Mut. Fire Ins. Co. v. Dennison,* 108 Hawai'i 380, 384, 120 P.3d 1115, 1119 (2005) (quoting *Labrador v. Liberty Mut. Group,* 103 Hawai'i 206, 211, 81 P.3d 386, 391 (2003)) (internal quotation marks omitted). "Addi-tionally, the general principles of construction which apply to statutes also apply to administrative rules." *Brown v. Thompson,* 91 Hawai'i 1, 9, 979 P.2d 586, 594 (1999) (citation and internal quotation marks omitted).

## III. DISCUSSION

### A. Subject Matter Jurisdiction

 As a threshold matter, the State defendants argue that the circuit court lacked subject matter jurisdiction because the federal adjudication path—*i.e.,* a full and fair evidentiary hearing by the SLA, arbitration conducted by the USDOE panel, and appeal and final review by the federal courts—was imported into the Hawai'i RSA through HAR § 17–402–17(j). The State defendants argue that "[t]he arbitration required by the [federal] [a]djudication [p]ath is the *mandatory, exclusive, statutory* arbitration provision required by the [federal] RSA and the HAR and *is not subject to circumvention.*" (Some emphases added.) The State defendants, therefore, submit that the state judiciary does not have jurisdiction over this case. The plaintiffs, however, respond that the federal adjudication path has no application in this case because the remedial path is associated with the federal RSA, which involves solely "vending facilities on federal property." The plaintiffs further maintain that this court has subject matter jurisdiction over the instant case because this court asserted its jurisdiction in *Hawai'i Blind Vendors Association v. Department of Human Services,* 71 Haw. 367, 791 P.2d 1261 (1990), wherein this court specifically stated that DHS and the circuit court "have concurrent original jurisdiction." *Id.* at 371, 791 P.2d at 1264.

Inasmuch as we are guided by the principle that, "[i]f a court lacks jurisdiction over the subject matter of a proceeding, any judgment rendered in that proceeding is invalid [and that,] therefore, such a question is valid at any stage of the case," *Bush v. Hawaiian Homes Comm'n,* 76 Hawai'i 128, 133, 870 P.2d 1272, 1277 (1994) (citation, internal quotation marks and brackets omitted), this court is obliged to first insure that it has jurisdiction. *Id.; see also* HRCP Rule

12(h)(3) (2005) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action".). Accordingly, we must examine the overall scheme of the federal RSA and its relationship to the Hawai'i RSA to determine whether the federal adjudication path applies to state and county properties, thereby depriving the circuit court of jurisdiction.

### 1. The Federal RSA

We begin with the federal RSA. As previously stated, "the [federal RSA] provides the framework for a comprehensive regulatory scheme giving *blind persons* licensed by *state agencies* priority to operate vending facilities on all federal property." *Minnesota, Dep't of Jobs & Training v. Riley*, 18 F.3d 606, 608 (8th Cir.1994) (citing 20 U.S.C. § 107(a)-(b)) (emphases added). "The blind vendors became, in effect, third party beneficiaries of the agreements between the participating states and the federal government." *Delaware Dep't of Health & Soc. Servs.*, 772 F.2d at 1127.

States that choose to have their agencies become SLAs and participate in and administer the program must agree to several conditions enumerated in the federal RSA. Preliminarily, we note that, pursuant to 20 U.S.C. § 107a(a)(6)(B), the USDOE is mandated, "[t]hrough the Commission[er of the Rehabilitation Services Administration]," to "take such other steps, including the issuance of such rules and regulations, as may be necessary or desirable in carrying out the provisions of this chapter." Consequently, section 395 of Title 34 of the Code of Federal Regulations was promulgated and sets forth the requirements for states to become designated SLAs. Section 395.3, entitled "Application for designation as [SLA]; content," provides in pertinent part:

13. Section 395.2 provides that:
 (a) An application for designation as a[SLA] may be submitted only by the State vocational rehabilitation agency providing vocational rehabilitation services to the blind under an approved State plan for vocational rehabilitation services under Part 1361 of this chapter.
 (b) Such application shall be:

(a) An application for designation as a [SLA] under § 395.2 [13] shall indicate:

(1) *The [SLA's] legal authority to administer the program, including its authority to promulgate rules and regulations to govern the program;*

(2) The [SLA's] organization for carrying out the program, including a description of the methods for coordinating the State's vending facility program and the State's vocational rehabilitation program[;]

. . . .

(7) The policies and standards governing the relationship of the [SLA] to the vendors, including their selection, duties, supervision, transfer, promotion, financial participation, *rights to a full evidentiary hearing concerning a[SLA] action, and, where necessary, rights for the submittal of complaint to an arbitration panel.*

. . . .

(11) *The assurance of the [SLA] that it will:*

. . . .

(iii) Submit promptly to the Secretary for approval a description of any changes in the legal authority of the [SLA], its rules and regulations[;]

. . . .

(vii) *Submit to an arbitration panel those grievance of any vendor unresolved after a full evidentiary hearing* [.]

(Emphases added.) Section 395.4, in turn, obligates the SLAs to "promulgate rules and regulations which have been approved by the Secretary and which shall be adequate to assure the effective conduct of the State's vending facility program (including State licensing agency procedures covering the conduct of full evidentiary hearings)[.]" Finally, Section 395.13 indicates, *inter alia*, that:

(a) The [SLA] shall specify in writing and maintain procedures whereby such agency affords an opportunity for a full

(1) Submitted in writing to the Secretary;
(2) *Approved by the chief executive of the State;* and
(3) Transmitted over the signature of the administrator of the State agency making application.
(Emphasis added.)

evidentiary hearing to each blind vendor ... dissatisfied with any [SLA] action arising from the operation or administration of the vending facility program. When such blind vendor is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary....

Moreover, notwithstanding the above promulgated rules, Congress, in enacting the federal RSA, also included the following sections:

§ 107b. Application for designation as [SLA]; cooperation with Secretary; furnishing initial stock.

A State agency for the blind or other State agency desiring to be designated as the licensing agency shall [ ] ... make application to the Secretary and agree—

....

(5) to issue such regulations, consistent with the provisions of this chapter, as may be necessary for the operation of this program;

(6) *to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and to agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration* as provided in **section 107d–1** of this title.

(Emphases added.) Section 107d–1(a) provides in relevant part:

*Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a[n SLA] a request for a full evidentiary hearing,* which shall be provided by such agency in accordance with section 107b(6) of this title. *If such blind licensee is dissatisfied with any action taken or decision ren-*

*dered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to* **section 107d–2** *of this title,* and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

20 U.S.C. § 107d–1(a) (emphases added). Section 107d–2, entitled "Arbitration," states in pertinent part:

*Upon receipt of a complaint filed under section 107d–1 of this title, the Secretary shall convene an ad hoc arbitration panel as provided in subsection (b) of this section.* [14] *Such panel shall,* in accordance with the provisions of subchapter II of chapter 5 of Title 5[, *i.e.,* the APA, *see supra* note 5], *give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action* for purposes of chapter 7 of such Title 5.

20 U.S.C. § 107d–2 (emphases added).

▉▉▉ Accordingly, taking into account the federal RSA and its regulations, we believe that, although states are not required to participate in the vending facility program, those that desire to gain access to federal properties to establish vending facilities for their blind vendors to operate must submit a state vending facility plan that conforms with the requirements of the federal RSA and its regulations. In turn, the language in each of the above provisions is clear: for a state agency to become an SLA and participate in the federal RSA program, it must agree to the federal adjudication path in dealing with blind licensees who are dissatisfied with the operation of the vending program. *See Comm. of Blind Vendors of the Dist. of Columbia v. Dist. of Columbia,* 28 F.3d 130, 135 (D.C.Cir.1994) ("The inclusion of a detailed grievance procedure to resolve vendor dis-

---

**14.** Subsection (b) of section 107d–2 provides in relevant part:

(1) The arbitration panel convened by the Secretary to hear grievances of blind licensees shall be composed of three members appointed as follows:

(A) one individual designated by the [SLA];

(B) one individual designated by the blind licensee; and

(C) one individual, not employed by the [SLA] or, where appropriate, its parent agency, who shall serve as chairman, jointly designated by the members appointed under subparagraphs (A) and (B).

If any party fails to designate a member under subparagraph (1)(A), (B), or (C), the Secretary shall designate such member on behalf of such party.

putes ... is the strongest evidence of Congressional intent" that aggrieved vendors pursue their administrative remedies before resorting to judicial adjudication.); *see also Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 103 (D.C.Cir.1986). In consideration of the states' agreements to subject themselves to the federal adjudication path, the federal government grants to state agencies the right to place licensed blind vendors on federal sites and to receive federal funds, as discussed *infra. See Ramsey,* 366 F.3d at 6; *Delaware Dep't of Health & Soc. Servs.,* 772 F.2d at 1127.

We fully recognize that the federal RSA, as previously mentioned, involves the operation of a "vending facility on **any [f]ederal property.**" 20 U.S.C. § 107(a) (emphasis added). Thus, on its face, it appears that DHS is obligated to comply with the federal adjudication path only with respect to claims relating to its management of vending machines on *federal* property. However, in our view, it is the *overall scheme of the federal RSA* that dictates adherence to the federal adjudication path even in those situations involving non-federal property. *See* 34 C.F.R. Part 395.

As previously noted, section 107a(a)(5) authorizes the Secretary to designate to the state agency in each state the responsibility of issuing "licenses to blind persons ... for the operating of vending facilities on *Federal and other property* in such [s]tate[.]" 20 U.S.C. § 107a(a)(5) (emphasis added). Although Congress clearly intended the RSA program to apply to both federal and non-federal properties, *see also supra* note 4, the phrase "other property" is not defined anywhere in the federal RSA, *i.e.,* 20 U.S.C. §§ 107 through 107f, including the pertinent definition section, 20 U.S.C. § 107e. However, because Congress has delegated to the Secretary the power to "prescribe regulations designed to assure[, *inter alia,*] that—(1) the priority under this subsection is given to such licensed blind persons (including assignment of vending machine income pursuant to section 107d–3 of this title to achieve and protect such priority)," 20 U.S.C. § 107(b), "we must defer to his regulatory interpretations of the Code so long as they are reasonable." *Cottage Sav. Ass'n v. Comm'r of Internal Revenue,* 499 U.S. 554, 560–61, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991) (citation omitted). The term "other property" is specifically defined within part 395 of the Code of Federal Regulations, entitled "Vending Facility Program For the Blind on Federal and *Other Property,*" (emphasis added), as "property which is not [f]ederal property *and on which vending facilities are established or operated by the use of any funds derived in whole or in part, directly or indirectly, from the operation of vending facilities on any [f]ederal property.*" 34 C.F.R. § 395.1(n) (emphasis added). We note that, although

> [t]he principal benefit that a state receives for participating in the program is an opportunity to improve the lot of its blind population[, a] participating state also receives funds. For example, even if no blind vendor operates vending facilities on a particular federal property, *the relevant SLA receives income from vending machines on that property; these proceeds can be used to fund retirement, health insurance, sick leave, and vacation time for blind vendors and to defray various costs associated with running the program.* 20 U.S.C. §§ 107d–3(a), (c).

*Ramsey,* 366 F.3d at 6 (emphasis added). Section 107d–3 expressly provides that

> vending machine *income* obtained from the operation of vending machines on [f]ederal property *shall accrue* (1) to the blind licensee operating a vending facility on such property, or (2) *in the event there is no blind licensee operating such facility on such property, to the [SLA] in whose State the [f]ederal property is located* [.]

20 U.S.C. § 107d–3 (emphases added). Thus, if funds derived from the operation of vending facilities on any federal property are used to establish or operate a blind vendor facility on non-federal property, the provisions of the federal RSA apply. In other words, "[m]anifestation of a state's willingness to enter the program, which applied to both federal and 'other buildings in [the] [s]tate,' required that the [SLA] 'make application to the [Secretary] and agree' to federal requirements." *Delaware Dep't of Health*

*& Soc. Servs.,* 772 F.2d at 1126 (some brackets in original and some added) (quoting Pub.L. No. 74–732, 49 Stat. 1559).[15]

Based on the foregoing, we believe that the federal RSA mandates that the participating states, like Hawai'i, acknowledge and accept the federal adjudication path. Review of the Hawai'i RSA further confirms our conclusion. We, therefore, turn our attention to the Hawai'i RSA.

### 2. The Hawai'i RSA

Preliminarily, we note that the legislature devoted HRS chapter 347 to blind and visually handicapped persons, wherein it generally authorizes DHS to

> *administer work with and for the blind, including* the registry of the blind, vocational guidance, training, and *placement in employment*[.]

HRS § 347–3 (1993) (emphases added). Under this chapter, DHS is specifically required to

> *provide vocational rehabilitation for blind and visually handicapped persons* **in accordance with the provisions of the federal Vocational Rehabilitation Act [ (VRA) ] and the Randolph–Sheppard Act** and in accordance with chapter 348[, which governs the state's vocational rehabilitation program], to the extent permitted by the amount appropriated, funds available from the federal government, and other donations, and grants.

HRS § 347–4 (1993) (emphases added).[16]

As indicated *supra,* Congress conditioned a state's participation in the federal RSA program upon, *inter alia,* adherence to the federal adjudication path. As mandated by section 107b(6), the state agency making application to the Secretary must agree to, *inter alia,*

> provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility

program an opportunity for a fair hearing, and to agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration[.]

20 U.S.C. § 107b(6). DHS applied to the Secretary to become an SLA on February 25, 1982. In so doing, DHS agreed to the above condition as evinced by the "[r]ules [g]overning the [v]ending [f]acility [p]rogram," *i.e., inter alia,* HAR § 17–402–17, which were attached to the application. *See supra* note 8.

Section 395.3 of the Code of Federal Regulations explicitly provides that a state's application for designation as an SLA must contain, *inter alia:*

> (1) The [SLA's] *legal authority to administer the program, including its authority to promulgate rules and regulations to* govern the program;
>
> (2) The [SLA's] organization for carrying out the program, *including a description of the methods for coordinating the State's vending facility program and the State's vocational rehabilitation program* [.]

34 C.F.R. § 395.3(a) (emphases added). The "legal authority to administer the program" and "description of the methods for coordinating the State's vending facility program" are found in HRS §§ 102–14 and 347–12.5 and HAR § 17–402–17. Further, as a condition to being licensed as SLAs, states must agree to conduct full evidentiary hearings on any complaint arising from the operation or administration of the blind vendor program and to submit to arbitration before a USDOE panel convened by the Secretary, if requested by a dissatisfied vendor. *See* 20 U.S.C. §§ 107b(6) and 107d–1(a); 34 C.F.R. § 395.3(a). Section 395.4 further provides that "[t]he [SLA] shall promulgate rules and regulations *which have been approved by the Secretary and which shall be adequate to assure the effective conduct of the State's vending facility program* (including [SLA]

---

**15.** The phrase "federal and other *buildings* " was amended to "federal and other *property* " in the 1954 amendment. Pub.L. No. 83–565, § 13, 68 Stat. at 663 (emphases added). The revision was made to allow blind vendors to establish vending stands in locations that "would not have been encompassed" under the phrase "federal and other buildings." *See* S.Rep. No. 93–937 at 6.

**16.** Vocational rehabilitation, accordingly to the federal VRA, includes, *inter alia,* "increas[ing] employment of individuals with disabilities."

*procedures covering the conduct of full evidentiary hearings* )[.]" (Emphases added.)

The "rules and regulations" referred to above are found in HAR § 17–402–17, promulgated pursuant to HRS § 102–14(b) (DHS "shall adopt rules in accordance with [C]hapter 91, necessary for the implementation of this section, including, but not limited to rules to assure that priority be given to registered blind [vendors]"). As previously quoted, HAR § 17–402–17(j) provides in pertinent part that:

Evidentiary hearings and arbitration of vendor complaints shall be provided for in the following manner:

(1) *Each vendor shall have the right and opportunity to assert [a] claim and to secure, in an informal administrative proceeding, review of a grievance or dissatisfaction with a decision made or action taken. This shall be in accordance with the State's vocational rehabilitation rules and standards.*

(2) *Each vendor or a personal representative or next of kin shall be given an opportunity for a full and fair hearing if [the] vendor is dissatisfied with any action arising from the operation or administration of the vending facility program. Such requests for a hearing shall be submitted in writing to the director.*

. . . .

(9) *The vendor shall be informed of the right to request the [Secretary] to convene an ad hoc arbitration panel, if the vendor is dissatisfied with any action taken or decision as a result of the full evidentiary hearing.*

(Emphases added.) By its plain language, the first step in the Hawai'i RSA's procedure for the resolution of disputes is an informal administrative proceeding conducted pursuant to "the State's vocational rehabilitation rules and standards." HAR § 17–402–

17(j)(1). The vocational rehabilitation rule concerning complaints and fair hearings under that program is found in HAR § 17–400–4(d).[17] The rule, however, provides in relevant part that:

The administrative review is *not a prerequisite* to the fair hearing process:

(1) Administrative review shall be an informal procedure which may include the applicant or client or representative, conducted by the [vocational rehabilitation and services for the blind] division's [[hereinafter, the division]] supervisory or administrative staff, or both, [18] at the request of the applicant or client or their parent, guardian or representative. This request may be made orally or in writing.

(Emphasis added.) The administrative review, therefore, is not a precondition to a full evidentiary hearing before the SLA. Consequently, the full and fair hearing set forth in HAR § 17–402–17(j)(2) is the initial mandatory procedure. "[I]f the vendor is dissatisfied with any action taken or decision as a result of the full evidentiary hearing[,]" the administrative rule requires that the SLA inform the complainant (*i.e.*, vendor) of "the right to request the [Secretary] to convene an ad hoc arbitration panel[.]" HAR § 17–402–17(j)(9). Thus, the next stage of the dispute resolution procedures under the Hawai'i RSA program is essentially an appeal to the Secretary, who, in turn, convenes an ad hoc arbitration panel to review the concerns raised by the dissatisfied vendor.[19]

▆▆▆ By becoming an SLA and participating in the RSA program, Hawai'i—like California—agreed to comply with the federal adjudication path for its blind vendors' grievances. In a California case, reviewed by the United States Court of Appeals for the Ninth Circuit, the court was confronted with the issue of the enforceability of the USDOE arbitration panel's award against the state.

---

17. HAR § 17–400–4 was promulgated pursuant to the authority provided in HRS § 348–6 (1993).

18. DHS is "the sole state agency to administer the vocational rehabilitation program." HAR § 17–400–2; *see also* HRS § 348–3. The division is "the designated administrative unit of [DHS] to administer the vocational rehabilitation program in the State[.]" HAR § 17–400–2.

19. As previously stated, 20 U.S.C. § 107d–2(a) provides that the decision rendered by the arbitration panel "shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5" by the federal courts.

*Premo v. Martin,* 119 F.3d 764, 766 (9th Cir.1997), *cert. denied,* 522 U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998). Although the property involved is controlled by the federal government and the issue related to the enforcement of an arbitration award, the Ninth Circuit's analysis of the federal RSA as it relates to the California's RSA is relevant and instructive:

> The State of California has not expressly consented to suit. Nor has California enacted a statute that provides for waiver. *The California statute establishing the state counterpart to the federal [RSA] does provide that the decision of an arbitration panel "shall be final and binding on the parties except as otherwise provided in the act." Cal. Welf. & Inst.Code § 19635 (West 1991).* [20] While this statute clearly reflects California's intent to be bound by Randolph–Sheppard arbitral awards, it does not provide clear enough consent to suit in federal court to amount to an express statutory waiver of sovereign immunity.
>
> However, *the evidence that Congress conditioned state participation in the Randolph–Sheppard program on consent to federal judicial enforcement of compensatory awards is overwhelming.* The statute explicitly requires participating states to agree to a number of conditions. Specifically, each state agency "shall ... agree" to provide any dissatisfied blind vendor with the opportunity for a fair hearing and "to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration." 20 U.S.C. § 107b. The state further provides that arbitration *"shall be final and binding on the parties."* 20 U.S.C. § 107d–1(a) (emphasis added)....
>
> *Under the circumstances, there is no "room for any other reasonable construction" of the statute.* **The overwhelming implication of the statute is that[,] by agreeing to participate in the [RSA] program, states have waived their sovereign immunity to enforcement of such awards in federal courts.**

*Id.* at 770 (citations omitted) (emphases added). Like California, the State has incorporated the federal adjudication path into its RSA program and, in so doing, has acknowledged its obligation to the United States to conduct full evidentiary hearings at the agency level regarding blind vendor grievances and, thereafter, if requested, to submit to arbitration before a USDOE panel convened by the Secretary. Such acknowledgment is also consistent with the conditions for licensure as an SLA, discussed *supra.* In other words, by applying for and receiving the SLA designation and by issuing the regulations required by 20 U.S.C. § 107b(5), including the regulation providing the required remedies to dissatisfied vendors, *i.e.,* HAR § 17–402–17(j)(2)–(9), the State, contrary to the dissent's contention, has implicitly surrendered its sovereign immunity to suits in federal courts—not state courts—via the federal adjudication path. *See also Office of Hawaiian Affairs v. State,* 110 Hawai'i 338, 360, 133 P.3d 767, 789 (2006) ("limits on the State's waiver of sovereign immunity ... must be strictly construed and cannot [be] extend[ed]") (internal quotation marks omitted); *Allied/Royal Parking L.P. v. United States,* 166 F.3d 1000, 1003 (9th Cir.1999) ("limitations and conditions of consent to suit must be strictly observed and exceptions thereto are not to be implied") (citation and internal quotation marks omitted). HAR § 17–402–17, therefore, does not contradict or contravene the legislative purpose behind the Hawai'i RSA nor the purpose behind the federal RSA.[21] *See In re Wai'ola O Moloka'i,*

---

20. Section 19635 specifically provides in relevant part that:

> If [a] blind vendor is dissatisfied with any action taken or decision rendered as a result of [a full evidentiary] hearing, he may filed a complaint with the Secretary ... who shall convene a panel to arbitrate the dispute pursuant to Section 6 of the Randolph–Sheppard Act [, *i.e.,* 20 U.S.C. § 107d–2.]

21. The dissent contends that "[n]either HRS § 102–14 nor HRS § 347–12.5 can be read as delegating to the DHS the authority to divest the circuit courts of their jurisdiction over claims involving state law[,]" dissenting op. at 425, 146 P.3d at 140; "such application of the rule would violate state law and well-established principles of agency law." Dissenting Op. at 427, 146 P.3d at 142. Thus, the dissent maintains that, "if HAR § 17–402–17(j) attempts to divest the state

*Inc.*, 103 Hawai'i 401, 425, 83 P.3d 664, 668 (2004) ("If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning." (Citation omitted.)); *see also State v. Kotis*, 91 Hawai'i 319, 331, 984 P.2d 78, 90 (1999) ("Administrative rules, like statutes, have the force and effect of law." (Citations omitted.)).

The dissent, however, asserts that the legislature "vested jurisdiction in the circuit court for a claim arising under the Hawai'i RSA," dissenting op. at 428, 146 P.3d at 143, because it mandated that rules be adopted in accordance with HRS chapter 91, which "specifically provides for judicial relief in the circuit court for persons aggrieved by an agency declaratory ruling or a decision in a contested case." *Id.* (citing HRS § 91–7(a) (1993)) (internal quotation marks omitted). We note that the provisions contained in HRS chapter 91 can essentially be divided into two parts that authorize (1) the promulgation of rules and (2) the establishment of adjudicatory procedures. The rule-making procedures provide for, *inter alia:* (1) the adoption of rules by agencies, HRS § 91–3 (Supp.2005); (2) the filing and effectuating of rules, HRS § 91–4 (1993); and (3) the publi-cation of rules, HRS § 91–5 (Supp.2005). The provisions governing the establishment of adjudicatory procedures provide for, *inter alia:* (1) declaratory rulings by agencies, HRS § 91–8 (1993); (2) contested case hearings, HRS § 91–9 (1993 & Supp.2005); and (3) judicial review of contested cases, HRS § 91–14 (Supp.2005).

HRS § 102–14(b) specifically states that DHS "shall adopt rules in accordance with [C]hapter 91," which the dissent maintains includes the authority to establish adjudicatory procedures of Chapter 91. However, had the legislature intended that the adjudicatory provisions of Chapter 91 be followed, it would have expressly indicated such intent as it has done in other statutes on various subjects. For instance, in enacting HRS § 174C–8 (1993), relating to the State Water Code, the legislature provided that rules concerning water resources "*shall be adopted in conformity with [C]hapter 91,*" (emphasis added), mandating further that:

> All proceedings before the commission [on water resource management] concerning the enforcement or application of any provision of this chapter ... or the issuance, modification, or revocation of any permit or license ... *shall be conducted in accordance with [C]hapter 91. ...*

courts of their jurisdiction, it is invalid." Dissenting Op. at 427, 146 P.3d at 142. The dissent, however, fails to recognize that the Hawai'i Legislature delegated to the agencies the authority to

> accept, receive on behalf of the State, and receipt for, any and all grants or allotments for federal-aid moneys made available to the State by or pursuant to an act of Congress, and *enter into or make such* plan, *agreement,* or other arrangement *with the agency designated by the act of Congress as is necessary to carry out the purpose of the Act*[.]

HRS § 29–14 (1993) (emphases added). Specifically, with respect to the blind or visually handicapped persons:

> [DHS] may, as an agency of the State for the assistance of blind or visually handicapped persons, *do all things* which will enable the State and the blind and the visually handicapped in the State *to have the benefits of all federal laws for the benefit of blind and visually handicapped persons.*

HRS § 347–5 (1993) (emphases added). Under the federal RSA, Congress mandated states to agree to certain conditions, including the acceptance of the federal adjudication path, in order to gain access to federal properties and to obtain federal funds, which are derived primarily in the form of vending machine income from non-blind vendors' machines on federal properties, 20 U.S.C. § 107d-3. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 640, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ("When Congress acts pursuant to its spending power, it generates legislation much in the nature of a contract: in return for federal funds, the States agree to comply with the federally imposed conditions." (Citation and internal quotation marks omitted.)); *see also Office of Hawaiian Affairs v. State*, 96 Hawai'i 388, 397, 31 P.3d 901, 910 (2001). Clearly, DHS was given the authority to enter into a contractual relationship with the United States to participate in the program for the benefit of the State's blind and visually handicapped persons. In turn, DHS promulgated HAR § 17–402–17 and incorporated one of the federal conditions within its rules, that is, the federal adjudication path. We note further that the USDOE, in 34 C.F.R. § 395.2(b)(2), *see supra* note 13, obligates the chief executive of the State to approve DHS's application for designation as an SLA. Here, the chief executive of the State, George R. Ariyoshi, approved DHS's application.

HRS § 174C–9 (1993) (emphasis added). Similarly, other statutes demonstrate the legislature's express adoption of the rule-making and adjudicatory procedures of Chapter 91. *See, e.g.,* (1) HRS § 368–3 (Supp.2005) (requiring the civil rights commission to "adopt rules under [C]hapter 91") and HRS § 368–14 (1993) (providing that civil rights commission hearings to be conducted in accordance with Chapter 91); (2) HRS § 431:10B–113(a) (2005) (adopting Chapter 91's rule-making procedures for credit life insurance) and HRS § 431:10B–108(k) (2005) (adopting Chapter 91's adjudicatory process for approval and denial of, *inter alia,* the schedules of premium rates by the insurance commissioner); (3) HRS § 431:10C–214 (2005) (adopting the rule-making procedures for the disposition of insurance claims arising out of motor vehicle accidents) and HRS § 431:10C–212(c) (2005) (adopting the adjudicatory procedures for the denial of claim by insurer); and (4) HRS § 432E–12 (2005) (adopting the rule-making procedures for patients' bill of rights) and HRS § 432E–6(4) (2005) (adopting the adjudicatory process for review of manage care plans). Here, the Hawai'i RSA statutes do not contain language demonstrating the legislature's intent that Chapter 91's adjudicatory provisions be followed.

Moreover, even when a statute's reference to Chapter 91 is silent as to the adoption of its adjudicatory provisions, it appears that the agency has the discretion to decide whether to adopt the adjudicatory provisions of HRS chapter 91 when promulgating its administrative rules. For example, although the Hawaiian Homes Commission Act (HHCA)—specifically, HHCA § 222 (Supp. 2005)—expressly indicates that the department of Hawaiian home lands "shall adopt rules and regulations and policies in accordance with [C]hapter 91," it is silent as to the adoption of the adjudicatory provisions. Nevertheless, the department adopted the adjudicatory provisions of Chapter 91. *See* HAR § 10–5–32. Similarly, HRS chapter 448B, concerning the licensure of dietitians, provides that the director of health shall "[a]dopt, amend, or repeal rules pursuant to [C]hapter 91 as the director finds necessary to carry out this chapter." HRS § 448B–3(2)

(Supp.2005). Yet, chapter 448B is silent as to the application of the adjudicatory provisions. Title 11, chapter 79 of the HAR, applicable to dietitians, however, clearly incorporated the adjudicatory provisions of Chapter 91 into its dispute resolution procedures. HAR § 11–79–13(f). Such is not the case here. HAR § 17–402–17 does not dictate that the grievance process is to be conducted in accordance with Chapter 91. In fact, HAR § 17–402–17 clearly establishes a procedure that is consistent with the purpose of the Hawai'i RSA and the federal RSA. As required by the federal RSA, HAR § 17–402–17 recognizes the federal adjudication path, a condition that the State must accept to become a designated SLA. Accordingly, we are unconvinced that the reference to the rule-making procedures of Chapter 91 in HRS § 102–14(b) mandates the adoption of the chapter's adjudicatory provisions.

We also note that HRS § 347–12.5 lends further support that jurisdiction lies with federal courts. Section 347–12.5, which establishes the RSR Account, provides that:

(a) ... The [RSR A]ccount shall be used by [DHS] for:

(1) The provision of the following benefits for blind vendors:

(A) *A retirement or pension plan;*

(B) *Health insurance;* and

(C) Sick and vacation leave;

(2) *The maintenance and replacement of equipment used in the blind vending program;*

(3) *The purchase of new equipment to be used in the blind vending program;* and

(4) The provision of *management services,* which shall include, but not be limited to:

(A) The hiring of consultants;

(B) The sponsoring of training seminars;

(C) Transportation;

(D) Per diem for vendors to attend meetings of the state committee of blind vendors;

(E) Services for the state committee of blind vendors; and

(F) Other costs related to the blind vending program.

(b) Income from vending machines on *federal, state, and county properties* that are within reasonable proximity to, and in direct competition with, a blind vendor may be deposited into the account and then disbursed to the blind vendor.

(c) *The revolving account shall consist of funds derived from:*

(1) *Vending machine income generated by federal, state, and county operations;*

(2) Any other legally accepted source of income; and

(3) Donations.

(Emphases added.) Thus, Hawaii's statute acknowledges its acceptance of the federal RSA program and sets out regulations, to the extent permitted by the federal RSA, that are applicable to federal, as well as state and county, properties. The RSR Account provides a strong implication that the state and county properties fall within "other property" because income generated from state and county vending facilities, as well as federal facilities, are deposited into one central account, from which funds may be used for the benefit of blind vendors in Hawaiʻi. In other words, the Hawaiʻi RSA unequivocally authorizes the use of funds in the RSR Account "derived in whole or in part, directly or indirectly, from the operation of vending facilities on any [f]ederal property," 34 C.F.R. § 395.1(n), to, *inter alia,* provide management services, maintain and replace equip-

ment, and purchase new equipment for vending facilities on non-federal property.

 Moreover, pursuant to the authority granted by the legislature to promulgate rules and regulations, DHS recognized the legislative intent that state and county properties are to be considered "other property" when it defined the phrase to mean "property which is not federally controlled property and on which vending stands are established or operated." HAR § 17–402–17(a). It also defined "vendor" as "a blind licensee who is operating a vending facility on federal or *other property.*" HAR § 17–402–17(a) (emphasis added). Thus, under the Hawaiʻi RSA's rules and regulations, "other property" clearly includes state and county properties.[22]

If we were to accept the dissent's flawed-theory that the federal RSA applies to federal property and the Hawaiʻi RSA applies to state and county properties, there would have been no need for DHS to define the phrase "other property." In fact, if the dissent's theory is correct, the above stated definitions are nonsensical. For example, if the Hawaiʻi RSA applies only to state and county properties, as the dissent maintains, then "other property" must necessarily be defined as "federally controlled property"—rather than "*not* federally controlled property." Likewise, a "vendor" must necessarily be defined as "a blind licensee who is operating a vending facility on [*state and county property* ] or other property [ (*i.e.,* federally controlled property) ]." The fact that DHS, in crafting its administrative rules pertaining to blind vendors adhered to the federal

---

**22.** The dissent suggests that reliance upon "other property" is "without factual basis" because "there is absolutely no evidence in the record to conclude that the City received funds from federal property and used those funds to establish or operate vending facilities on City property. It is also undisputed that the State did not operate vending machines on [C]ity property." Dissenting Op. at 421, 146 P.3d at 136 (emphases omitted). It is undisputed that the City violated the Hawaiʻi RSA by placing its own leased machines in its public buildings, rather than providing blind vendors those spaces for their vending establishment. Had the City complied with the Hawaiʻi RSA, blind vendors would be given priority to place their vending machines in the City's buildings. In turn, the funds held in the RSR Account, *i.e.,* "income [deriving] from vend-

ing machines on federal, state, and county properties," HRS § 347–2.5(b), would be used for "the maintenance and replacement of equipment" and the "purchase of new equipment," HRS § 347–2.5(a), thereby, rendering the vending machines on the City's properties as "other property." *See also* HAR § 17–402–17(m)(1) (DHS "shall furnish each vending stand with adequate suitable equipment and adequate initial stock of merchandise necessary for the establishment and operation of the facility."). Accordingly, the lack of "evidence in the record" bears no relevance to the determination as to whether the county property would constitute "other property." As discussed *supra,* the state and county properties clearly fall under "other propert[ies]" of the federal RSA.

"viewpoint," clearly demonstrates its recognition of the relationship between the federal and the Hawai'i RSAs, including its incorporation of the federal adjudication path.

■■■■ Our conclusion that the federal adjudication path prescribed in HAR § 17–402–17(j) is applicable to vending operations in all state, county, and federal properties in Hawai'i is consistent with *federal* case law, where federal courts have reviewed decisions rendered by an ad hoc arbitration panel convened by the Secretary involving certain states' blind vendors' programs operating in state or county properties. For example:

a. *Smith v. Rhode Island State Servs. for the Blind & Visually Handicapped, 581 F.Supp. 566 (D.R.I. 1984)*

In *Smith*, the United States District Court for the District of Rhode Island (the U.S. district court) examined certain regulations promulgated by Rhode Island's Department of Social and Rehabilitative Services, Division of Services for the Blind and Visually Impaired (RISB), *i.e.*, Rhode Island's SLA. There, the blind-vendor-plaintiff appealed from the decision of an ad hoc arbitration panel, such panel having (a) denied the plaintiff's request that he be appointed to a particular concession stand, Stand # 54 at the Garrahy Judicial Complex in Providence, Rhode Island,[23] and (b) remanded for proper promulgation of clear and unambiguous regulations regarding the seniority system. 581 F.Supp. at 567.

The U.S. district court expressly noted that:

*Under the neoteric federal regulations, an application for designation as a state licensing agency must contain a plan outlining the rules and regulations applicable to the state's blind vendor program,* including the rules relating to the transfer and promotion of licensees [at issued in this case]. 34 C.F.R. §§ 395.3, 395.5. In accordance with this requirement, the RISB conceived, incubated, nurtured and thereafter submitted an ichnographic masterpiece yclept "Baby Randolph" as an adjunct to RISB's application for redesignation as a[n SLA] during the winter of 1979–1980. The rule governing the method of selection, transfer and promotion of blind vendors is found in Attachment IX–A, Paragraph C. 1 of that plan. That section provides in substance that the transfer and promotion of vendors shall be based upon seniority, and outlines the method by which seniority is to be calculated.

*Id.* at 568 (emphasis added). Thereafter, in approximately 1977, in response to newly enacted federal regulations, "RISB began developing a state plan of rules and regulations for the Rhode Island blind vendor program." *Id.* at 569. The state's rules and regulations were eventually promulgated and subsequently approved by the federal government. Pertinent to this case, Article IX, entitled "Selection, Transfer and Promotion of Vendors" provided:

The SLA . . . with the active participation of the State Committee of Blind Vendors, hereby establishes a selection transfer and promotion system for vendors which will be uniformly applied to all vendor vacancies that develop or occur in the vending facilities program as outlined in Attachment IX–A.

*Id.* at 570.

Attachment IX–A, Paragraph C.1 addressed the method of selection, transfer and promotion of vendors in the following verbiage:

In accordance with the standards as outlined in Paragraphs A and B, the selection, transfer and promotion of vendors shall be based upon seniority. The SLA shall establish and maintain a roster containing the name of each vendor, the date of his or her original licensing, any subsequent date(s) of relicensing and their vending facility address. Seniority, then, shall be calculated from the original date of licensing which shall be multiplied by the number of months during which the vendor

---

**23.** The Garrahy Judicial Complex houses both state and county entities, such as the family court, district court, workers' compensation court, traffic tribunal, county sheriff's office, and the public defenders.

was assigned and licensed to operate any vending facility which has been established by this SLA.

*Id.*

Subsequently, RISB compiled an updated seniority roster, wherein the plaintiff was ranked junior to another licensed blind vendor who eventually was assigned to Stand # 54. RISB did not count employment at any agency stand towards seniority in the blind vendor program. The plaintiff appealed the decision of the RISB, arguing that his time in service at an agency stand should have been counted. *Id.* The hearing officer declined to disturb RISB's award of Stand # 54. *Id.* Thereafter, the plaintiff appealed that decision to an arbitration panel pursuant to 20 U.S.C. § 107d–2. Therein, the arbitrator determined that the seniority rules as promulgated by RISB were ambiguous and ordered RISB to adopt a clear and unambiguous seniority scheme. *Id.* at 571. The arbitrator specified that Stand # 54 was to remain with the other licensed blind vendor pending a permanent award of Stand # 54.

On appeal to the U.S. district court, the plaintiff pressed his claims for monetary damages and for modification of the seniority list to reflect what he asserted was his proper rank. *Id.* at 572. The court denied and dismissed the plaintiff's claims, holding that the arbitrator's finding with respect to the ambiguity of the language contained in the state's seniority rule was supported by the evidence and was neither arbitrary nor capricious. *Id.* at 573–74.

b. *McNabb v. United States Dep't of Educ., 862 F.2d 681 (8th Cir.1988)*

■ The factual and procedural background in *McNabb* further indicates that disputes arising from the operation of the state's blind vending program on state property are reviewable by federal courts.

The facts are as follows:

McNabb is a blind person licensed under the [RSA] to operate a vending facility in Arkansas. On September 12, 1980, McNabb bid for three telephone company vending facilities. In violation of applicable laws and regulations, two of these facil-

ities, which were more profitable than the stand McNabb then operated, were awarded to blind vendors with less seniority than McNabb.

On October 20, 1980, McNabb filed a grievance, requesting a full evidentiary hearing as provided for in 20 U.S.C. § 107d–1(a). On February 11, 1981, the hearing officer upheld the denial of the vending stands to McNabb.

McNabb then filed a complaint with the [USDOE], also pursuant to 20 U.S.C. § 107d–1(a), requesting that an arbitration panel be convened to decide his entitlement to one of the facilities he had been denied. He later amended his complaint to request specific relief: assignment to one of the stands with damages for the period he was denied a stand, as well as attorney's fees and costs.

862 F.2d at 682. The USDOE arbitration panel took the position that neither compensatory relief nor attorney's fees were contemplated under the RSA and that such awards would be contrary to the principle of sovereign immunity. *Id.* at 683. Subsequently, another arbitration decision was issued, finding that McNabb had wrongfully been denied one of the stands. "As relief, the panel gave McNabb[, *inter alia,*] a continuing right of assignment to the first of the two stands at issue that became vacant." 862 F.2d at 683

Thereafter, McNabb requested that the USDOE arbitration panel reconvene to award him additional relief. The arbitration panel refused to reconvene, taking the same position that the RSA and the Eleventh Amendment to the United States Constitution precluded the panel from awarding compensatory relief or attorney's fees against state agencies. *Id.* McNabb appealed to the federal district court, wherein the court held that

arbitration panels convened pursuant to the [RSA] have the authority to award compensatory relief and attorney's fees. Without specifically discussing the issue of whether the eleventh amendment barred such awards, the district court stated that it chose to follow the Third Circuit's decision in [*Delaware Department of Health and Social Services, Division for the Visu-*

*ally Impaired v. United States Department of Education,*] 772 F.2d 1123 (3d Cir.1985). In *Delaware*, the Third Circuit, which is the only circuit that has considered this question, held that: (1) the [RSA] impliedly authorizes compensatory damage awards against state agencies; (2) states that choose to participate in this federally-created program for blind vendors thereby waive their eleventh amendment immunity; and (3) attorney's fees are an appropriate element of compensatory damages for breach of contract between a blind vendor and a state agency.

*Id.* Accordingly, the USDOE and the Arkansas Department of Human Services appealed the federal district court's decision to the United States Court of Appeals for the Eighth Circuit. The Eighth Circuit essentially affirmed the judgment, holding that the arbitration panel, convened pursuant to the RSA, did not have authority to award retroactive money damages against the state for wrongful denial of stands to blind vendors, but was authorized to award prospective damages from the date of the arbitration panel's decision to the date vendor accepted assignment to a new vending facility. *Id.* at 683–88. For subsequent history, *see McNabb v. Riley,* 29 F.3d 1303 (8th Cir. 1994).

 c. *Delaware Dep't of Health & Soc. Servs., Div. for the Visually Impaired v. United States Dep't of Educ., 772 F.2d 1123 (3d Cir.1985)*

As mentioned *supra, Delaware* involves an action by the state agency designated to administer the blind vendor program in Delaware, challenging a USDOE arbitration panel's award of retroactive monetary damages and attorney's fees to a blind vendor who was found to have been improperly denied a vending facility by the SLA.

The facts in *Delaware* indicate the following:

 Albanese is ... a blind vendor licensed by the Delaware Division of the Visually Impaired for participation in the Randolph–Sheppard program.... A federal regulation requires that [SLAs] establish in writing and maintain policies which gov-

ern transfer, promotion, and financial participation of vendors. 34 C.F.R. § 395.7(c) (1984). Delaware's rules set forth a comprehensive scheme for the distribution of funds generated to each blind vendor facility. Of particular significance to this case, is the state regulation which deals with transfer and promotion of blind vendors....

 ....

 In August of 1979, the Delaware Division of Visually Impaired solicited applications for management of its food vending facility at the Paramount Poultry Company, in Georgetown, Delaware. Two applicants responded. Albanese claimed to be the most senior qualified applicant, but the Division of Visually Impaired in October, 1979 appointed the less senior applicant. Albanese, pursuant to the Delaware regulations, mandated by 20 U.S.C. § 107(b)(6) and 34 C.F.R. § 395.13(a) (1984), filed a grievance, which resulted in a full evidentiary hearing before a state hearing examiner on February 24, 1981.

 The hearing examiner found that Albanese was the most senior qualified applicant, and ordered the Delaware Division of Visually Impaired to install him as manager of the Georgetown facility. Albanese commenced work there on April 1, 1981. The hearing examiner also ordered the state agency to pay a portion of Albanese's legal expenses.... The hearing examiner declined, however, to award Albanese the increased income he would have earned between the time he should have been appointed and April 1, 1998, when he commenced work.

772 F.2d at 1132 (citations omitted). Accordingly, Albanese filed a complaint with the USDOE, alleging his dissatisfaction with the failure of the state hearing examiner to award back pay and full legal attorney's fees. *Id.* An arbitration panel was convened and awarded Albanese monetary damages in the form of back pay and full attorney's fees. *Id.* at 1134. On appeal to the federal district court, the court vacated the arbitration decision and granted the state agency summary judgment. *Id.* at 1136. On appeal to the United States Court of Appeals for the Third

Circuit by Albanese, the Third Circuit Court essentially reversed the federal district court's decision.

d. *Fillinger v. The Cleveland Soc'y for the Blind, 587 F.2d 336 (6th Cir. 1978)*

In *Fillinger,* the blind-vendor-plaintiffs operated vending stands in Cleveland, Ohio, under the management of the Cleveland Society for the Blind (the defendant). The plaintiffs filed suit against the defendant, its executive director, and the Ohio Rehabilitation Services Commission, "which supervise[d] in Ohio a vending stand program established pursuant to federal law[.]" 587 F.2d at 337. The plaintiffs alleged numerous abuses in the operation of the program.

> The gist of their suit is that for many years the [defendant], acting without the consent of the blind vendors, has collected a higher percentage of gross sales than is "reasonable" under the [RSA] and has spent these funds for unauthorized purposes.

*Id.* The federal district court dismissed the complaint, and the plaintiffs appealed. *Id.* The United States Court of Appeals for the Sixth Circuit reversed and remanded the case. The Sixth Circuit granted the plaintiffs "an opportunity to exhaust their administrative and arbitration remedies. After such remedies are exhausted, any party aggrieved by the arbitrator's decision may petition the district court . . . for review." *Id.* at 338.[24]

Therefore, based on our examination of the overall scheme of the federal RSA and its relationship to the Hawai'i RSA, as well as federal case law, we hold that, inasmuch as the federal adjudication path applies to disputes arising from the Hawai'i RSA, the circuit court lacks subject matter jurisdiction to decide the merits of the instant case.

3. *Hawai'i Blind Vendor Ass'n v. Dep't of Human Servs.,* 71 Haw. 367, 791 P.2d 1261 (1990)

Lastly, the plaintiffs maintain that this court has jurisdiction to decide issues relating to the establishment of vending operations in state and county buildings for blind vendors under the Hawai'i RSA inasmuch as this state's only blind vendor case, *Hawai'i Blind Vendors Association v. Department of Human Services,* 71 Haw. 367, 791 P.2d 1261 (1990), has so determined. In that case, Maka'ala, a Hawai'i non-profit corporation that provides employment preferences to handicapped individuals, leased space at the airport for a retail concession. *Id.* at 370, 791 P.2d at 1263–64. Thereafter, DHS renewed the Maka'ala airport lease, without first providing notice of vacancy or opportunity for blind vendors to apply for the concession. *Id.* at 370, 791 P.2d at 1264. Consequently, the Hawai'i Blind Vendors Association (the plaintiff) brought action against DHS, alleging violations of the substantive and procedural law governing the blind vendor program. *Id.* at 368, 791 P.2d at 1263. The circuit court granted summary judgment in favor of DHS, and the plaintiff appealed. *Id.*

On appeal, DHS argued that the issue must first be brought through an administrative hearing before bringing an original action in the circuit court. *Id.* at 370–71, 791 P.2d at 1264. This court, however, held that it "need not decide this issue" inasmuch as,

> [u]nder the doctrine of primary jurisdiction, when a court and an agency have concurrent original jurisdiction to decide issues which have been placed within the special competence of an administrative agency, the judicial process is suspended pending referral of such issues to the ad-

---

24. As discussed *supra,* the foregoing cases involved disputes arising from the operation of vending machines on state properties or the administration of the state RSA program, which was established pursuant to the federal RSA. However, the dissent attempts to distinguish the above cases from the facts of this case by contending that these cases "involved *federal* claims brought under the federal RSA where the federal adjudication path was applicable." (Emphasis in original.) Dissenting Op. at 432, 146 P.3d at 147. The dissent takes such position because of its reliance upon its flawed bright-line treatment of the federal and Hawai'i RSAs. As previously discussed, the federal and Hawai'i RSAs are closely intertwined in that the participation of the federal RSA requires the creation of the Hawai'i RSA and acceptance of certain conditions set forth in the federal RSA, such as the federal adjudication path.

ministrative body for its views. Thus, the DHS agency process, if available, is the appropriate forum for an initial determination of the issues raised in this case.

*Id.* at 371, 791 P.2d at 1264 (citation omitted). Consequently, this court "remand[ed the blind vendors' claims] to DHS for an agency full and fair hearing." *Id.* at 374, 791 P.2d at 1266. Notably missing from this court's discussion is an examination of the interplay between the federal and the Hawai'i RSAs, which is understandable given the fact that the issue of subject matter jurisdiction was never raised. As a result, this court was not given the opportunity to examine the overall federal scheme and its relationship to the Hawai'i RSA as we have been compelled to do in the instant case. Thus, based on the foregoing examination and discussion, we overrule *Hawai'i Blind Vendors* to the extent that it can be interpreted to mean that this court has subject matter jurisdiction over issues arising from the Hawai'i RSA.

B. *The State Defendants' Appeal/Cross–Appeal and the Plaintiffs' Appeal/Cross–Appeal*

In light of our holding today, we need not address any of the remaining contentions raised by the State defendants and the plaintiffs' in their respective appeals and cross-appeals.

### IV. *CONCLUSION*

Based on the foregoing, we reverse the circuit court's August 22, 2001 final judgment for lack of subject matter jurisdiction.

Dissenting Opinion by POLLACK, J., with whom ACOBA, J., joins.

Today, the majority holds that a federal law has the effect of divesting Hawai'i courts of jurisdiction over a state claim brought under a Hawai'i statute. In my view, and with all due respect, the majority's holding: (1) violates the Eleventh Amendment to the United States Constitution; (2) is contrary to explicit language in the Randolph–Sheppard Act (federal RSA) and its legislative history; (3) misapprehends the "federal adjudication path" set forth in the federal RSA; (4) misinterprets the phrase "adopt rules in accordance with [Hawai'i Revised Statutes c]hapter 91" to mean that an agency can adopt rules that conflict with HRS chapter 91; (5) applies an administrative rule to divest state courts of jurisdiction in contravention of provisions of state law vesting such jurisdiction in state courts; (6) erroneously overrules *Hawaii Blind Vendors Ass'n v. Dep't of Human Servs.*, 71 Haw. 367, 791 P.2d 1261 (1990), which had previously determined subject matter jurisdiction existed in a similar case; and (7) reaches a result that is fundamentally at odds with the uniform weight of federal and state case authority. As such, the majority holding has broad adverse consequences beyond this case.

### I. *INTRODUCTION*

The federal RSA provides employment opportunities for the blind by granting "priority to those blind persons who desire to operate vending facilities on *federal* property." *Tenn. Dep't of Human Servs. v. U.S. Dep't of Educ.*, 979 F.2d 1162, 1163 (6th Cir.1992) (emphasis added) (citation omitted). Responsibility for implementing and overseeing the blind vendor program is divided between state and federal agencies.

Participating states may gain access to federal property by applying to the United States Department of Education (USDOE) to participate in and administer the program. "State agencies [of participating states] must agree to set up licensing programs for blind vendors[ and] match them with available contracts for vending facilities on *federal property.*" *New Hampshire v. Ramsey*, 366 F.3d 1, 5 (1st Cir.2004) (emphasis added). Once the state agency is approved, it is known as a "state licensing agency" (SLA). Any participating state also agrees to a three-step grievance process for dealing with blind licensees who are dissatisfied with the operation of the federal vending program (federal adjudication path).

In 1937, Hawai'i established its own counterpart statute to the federal RSA to provide blind persons with vending opportunities on state and county property (Hawai'i RSA). Plaintiffs claim that the City and County of Honolulu (City) failed to provide vending op-

portunities to blind persons on *city property* and that the State of Hawai'i (State) failed to enforce the requirements of the Hawai'i RSA.

The majority concludes that the federal RSA divests Hawai'i courts of jurisdiction over a claim brought under the Hawai'i RSA. The majority's interpretation transforms the federal RSA into a monolithic statute inclusive of virtually all state and county property in the United States, far beyond its present scope and directly contrary to Congressional intent. The decision also critically undermines important concepts of federalism and creates a new standard whereby the State may be haled into federal court based on an attenuated form of statutory waiver of sovereign immunity.

II. *UNDER THE ELEVENTH AMENDMENT, FEDERAL COURTS DO NOT HAVE JURISDICTION OVER PLAINTIFFS' CLAIMS BECAUSE THE STATE DID NOT WAIVE ITS SOVEREIGN IMMUNITY TO ALLOW STATE CLAIMS TO BE BROUGHT IN FEDERAL COURT*

The majority holds that federal courts have exclusive jurisdiction over the Plaintiffs' claims, which are based upon alleged violations of Hawai'i state law. Actually, the opposite is true. Under well-settled authority interpreting the Eleventh Amendment to the U.S. Constitution (Eleventh Amendment), federal courts have no jurisdiction over a claim in which a citizen files suit against a state or its agencies based on violations of that state's laws. "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

A federal court has the power to adjudicate such a claim only when the state has *expressly* waived its sovereign immunity to the claim being brought in federal court. The majority's assertion that the federal courts are the proper forum for this case directly contradicts the principles of sovereign immunity and federalism exemplified by

the Eleventh Amendment. The Eleventh Amendment reads:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.

By its express terms, the Eleventh Amendment refers only to suits against a state by out-of-state citizens. The United States Supreme Court has repeatedly held, however, that despite the limited terms of the amendment, states are also immune from suits brought in federal court by their own citizens. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Pennhurst,* 465 U.S. at 98–99, 104 S.Ct. 900; *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Great Northern Life Ins. Co. v. Read,* 322 U.S. 47, 51, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

The Court has determined that "federal jurisdiction over suits against unconsenting states 'was not contemplated by the Constitution when establishing the judicial power of the United States.'" *Pennhurst,* 465 U.S. at 98, 104 S.Ct. 900 (quoting *Hans,* 134 U.S. at 15, 10 S.Ct. 504). The Court has further established that:

> [T]he entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State ... and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification.

*Id.* at 98–99, 104 S.Ct. 900 (quoting *Ex parte State of New York,* 256 U.S. 490, 497, 41 S.Ct. 588, 65 L.Ed. 1057 (1921)) (emphasis in original). A state's immunity from suit in federal courts is not absolute. Federal courts, however, must consider the Eleventh

Amendment whenever a state appears as a defendant before them:

> The Eleventh Amendment may be described as either creating an immunity for states or establishing a jurisdictional limitation on federal courts.... [T]he effect of the Eleventh Amendment must be considered *sua sponte* by federal courts.

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii,* 810 F.2d 869, 873 n. 2 (9th Cir.1987). The Court has recognized only two circumstances under which an individual may sue a state in federal court. *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). "First, Congress may authorize such a suit in the exercise of its power to enforce the Fourteenth Amendment." *Id.* "Second, a State may waive its sovereign immunity by consenting to suit." *Id.*

"A State may waive its constitutional immunity through a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In each of these situations, the Court "requires an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Id.; see also Tenn. Dep't of Human Servs.,* 979 F.2d at 1166.

Thus, a court will find that a state has waived its sovereign immunity through a statute or constitutional provision " 'only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction.' " *Atascadero,* 473 U.S. at 239, 105 S.Ct. 3142 (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)) (brackets omitted). In *Kalima v. State,* 111 Hawai'i 84, 101, 137 P.3d 990, 1007 (2006), this court echoed the U.S. Supreme Court's language where it held that "a statutory waiver of sovereign immunity must be clear and unequivocal and must be strictly construed."

A close inspection of the federal RSA and the Hawai'i RSA reveals nothing in either statute that would be sufficient to strip the State of its Eleventh Amendment immunity for claims made pursuant to the state statute. Based on the applicable statutes and case law, the federal courts have no jurisdiction to adjudicate claims based on the State's alleged violations of the Hawai'i RSA.

## A. The Federal RSA Does Not Compel Waiver of Eleventh Amendment Immunity Over State Law Claims

Both the Third Circuit and the Ninth Circuit have held that participation in the federal RSA is conditioned on a waiver of a participating state's sovereign immunity to enforcement of arbitration awards based on violations of the federal RSA in federal court. *Premo v. Martin,* 119 F.3d 764, 769 (9th Cir.1997); *Del. Dep't of Health & Soc. Servs. v. U.S. Dep't of Educ.,* 772 F.2d 1123, 1137–38 (3d Cir.1985).

Waiver of sovereign immunity as a condition of participation in a federal program created by federal law *does not,* however, affect a state's sovereign immunity against being subjected to a lawsuit in federal court for a claim that arises from an alleged violation of a *state* statute. This is true even where, as in this case, the state statute is modeled after the federal statute.

The majority relies on the Ninth Circuit's analysis in *Premo,* 119 F.3d at 770, to conclude that the State has "*implicitly* surrendered its sovereign immunity to suits in federal courts" for violations of the Hawai'i RSA. Majority op. at 402, 146 P.3d at 117 (emphasis added). The majority's interpretation of *Premo* inordinately expands the holding in that case, inasmuch as *Premo* did not address blind vendor programs on state or county property and was entirely based on violations of the federal RSA.

The majority acknowledges that the property involved in *Premo* was controlled by the federal government and that the issue in the case was the enforcement of arbitration awards for violations of the federal RSA. Majority op. at 402, 146 P.3d at 117. The instant case involves neither the federal RSA nor the sections of Hawai'i law adopted by the legislature to enable the State to partici-

pate in the federal RSA. Rather, this case involves a state law that is separate and distinct from the federal law on which it is based. Thus, under the circumstances of this case, a waiver of Eleventh Amendment immunity cannot be implicit; it must be express and unequivocal. The majority, in relying on *Premo*, muddles the key distinction between that case and the one before this court and expands the reach of the federal courts far beyond the limits contemplated by the Ninth Circuit.

To reiterate, there is simply nothing in the federal RSA that can be read as an "unmistakably clear" statement by Congress that states which adopt their own legislation creating similar blind vendor programs for state property must waive their sovereign immunity to suit in federal court. One wonders, in fact, if Congress would have the power to condition state legislation on a waiver of claims under state law. Ultimately, this question remains rhetorical, because the federal RSA makes absolutely no mention of the existence or creation of statutes such as the Hawai'i RSA. Indeed, were the federal law repealed, the Hawai'i RSA would remain in place, as would the State's immunity to being sued in federal court on a claim arising from the Hawai'i RSA.

B. *The Hawai'i RSA Does Not Waive Eleventh Amendment Immunity Over Claims Arising Under the Hawai'i RSA*

There is also nothing in the text of the Hawai'i RSA or its administrative rules that can reasonably be read as providing consent for the State to be sued in federal court for a violation of the state statute. Neither HRS § 102–14 (Supp.2005) nor HRS § 347–12.5 (1993) mentions sovereign immunity or judicial review, as a comparison between the federal and state RSA demonstrates.

Section 107–d(1)(a) of the federal RSA provides a dissatisfied licensee with a full evidentiary hearing before the state licensing agency and an opportunity to appeal the agency's decision to the USDOE for review by an arbitration panel:

If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute.

Pub.L. No. 93–651, § 206, 89 Stat. at 2–11, codified at 20 U.S.C. § 107d–1(a). The USDOE's arbitration decisions are made subject to judicial review in § 6(a) of the 1974 Amendment:

[T]he Secretary shall convene an ad hoc arbitration panel . . . [,] give notice, conduct a hearing, and render its decision which *shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such title 5* [5 USCS §§ 701 et seq.].

*Id.*, codified at 20 U.S.C.S. § 107d–2(a) (emphasis added). Section 6(a)'s reference to chapter 7 of Title 5 is to the administrative procedures and judicial review provisions of the federal Administrative Procedures Act (APA). These provisions of the federal RSA establish the remedial scheme of the federal law.

In direct contrast, there is no reference whatsoever to the federal adjudication path in the statutory provisions of the Hawai'i RSA. In fact, neither HRS § 102–14 nor HRS § 347–12.5 mentions dispute resolution procedures. Nothing in the state statute demonstrates the clear intention of the legislature to waive the State's Eleventh Amendment immunity. Rather, the Hawai'i RSA merely provides that "[t]he department of human services . . . shall adopt rules in accordance with chapter 91, necessary for the implementation of this section[.]" HRS § 102–14(b).

The majority's particular reliance on the fund-mixing provision of HRS § 347–12.5 as evidence that the State has agreed to waive its Eleventh Amendment immunity for disputes arising from the Hawai'i RSA is plainly in error. There is nothing in the text of HRS § 347–12.5 that can be read as providing a "clear and unequivocal" waiver of the State's Eleventh Amendment immunity. There is also nothing in the legislative history of HRS § 347–12.5 that indicates any intention on the part of the legislature to waive such immunity.[1]

---

1. *See,* Sen. Stand. Comm. Rep. No. 205, in 1991 Senate Journal, at 866; Sen. Stand. Comm. Rep.

C. *The Hawai'i Administrative Rules Do Not, and Could Not, Waive the State's Eleventh Amendment Immunity*

The majority's reliance on HAR § 17–402–17(j), the vendor's complaint provision, is also misplaced. The provision states, in relevant part, as follows:

(j) Evidentiary hearings and arbitration of vendor complaints shall be provided for in the following manner:

(9) The vendor shall be informed of the right to request the [Secretary] to convene an ad hoc arbitration panel, if the vendor is dissatisfied with any action taken or decision rendered as a result of the full evidentiary hearing.

The rules adopted by Defendant–Appellant/Cross–Appellee Department of Human Services, State of Hawai'i (DHS) under the authority of HRS § 102–14(b) reference some aspects of the federal adjudication path. They do not adopt that path in its entirety. The key provisions of the federal RSA that provide for binding arbitration and judicial review are conspicuously absent from the HAR. In fact, HAR § 17–402–17(j), which the majority asserts "reflects the federal adjudication path," *makes no mention of sovereign immunity or judicial review.* The HAR provision also does not provide a right to appeal the arbitration decision in pointed contrast to the federal RSA.

In HAR § 17–402–17(j), the DHS expressly adopted some provisions of the federal adjudication path while omitting other provisions. The majority interprets the DHS's adoption of some aspects of the federal adjudication path as demonstrating the agency's intention to bind the State solely and exclusively to that path. Majority op. at 405, 146 P.3d at 120–21. This interpretation, however, does not explain the DHS's omission of relevant portions of the federal adjudication path from the express language of HAR § 17–402–17(j).

The DHS's failure to include these portions of the federal adjudication path must be viewed as an intentional decision to delete those portions from the language of HAR § 17–402–17(j). Because "courts will not presume an oversight on the part of the legislature where such presumption is avoidable," this omission must be seen as intentional. *See Reefshare, Ltd. v. Nagata,* 70 Haw. 93, 98, 762 P.2d 169, 173 (1988); *see also, Levy v. Kimball,* 51 Haw. 540, 544, 465 P.2d 580, 583 (1970) (legislature's omission of portion of federal statute must be seen as intentional rather than as an oversight).

This intentional omission, moreover, must be reasonably interpreted as intending to limit, not adopt, the federal adjudication path in the context of the Hawai'i law. Under firmly entrenched principles of statutory construction, the omission must be construed as purposefully differentiating between the federal adjudication path and that to be applied to the Hawai'i RSA.

It is a generally accepted rule of statutory construction that where the legislative body adopts a law of another State all changes in words and phraseology *will be presumed to have been made deliberately and with a purpose to limit,* qualify or enlarge the adopted law to the extent that the changes in words and phrases imply. Moreover where portions of the statute adopted are omitted the difference in phraseology ... may have special interpretative significance. Where ... the legislative body adopts isolated portions of the statute of another State to the exclusion of other provisions upon the same subject matter, included in the same section from which the language adopted was taken, *the statute as ultimately enacted must be given effect accordingly as such exclusions were intended to limit,* qualify or enlarge the portions adopted.

*Id.* at 544–45, 465 P.2d at 583 (emphasis added).

The clear implication of the DHS's intentional omission of relevant portions of the federal adjudication path from the Hawai'i law is *not* that the agency intended to adopt that adjudication path completely and exclusively for disputes arising from the Hawai'i statute, as the majority suggests. Rather, the logical and reasonable implication is that

No. 726, in 1991 Senate Journal, at 1023; Sen. Stand. Comm. Rep. No. 927, in 1991 Senate Journal, at 1170; Sen. Stand. Comm. Rep. No. 1189, in 1991 Senate Journal, at 1267–68.

the DHS intended to limit the reach of the federal adjudication path in the context of the Hawai'i RSA. HAR § 17–402–17(j)'s omitted reference to the federal RSA's binding arbitration and judicial review provisions must be viewed as intending to remove these provisions from the Hawai'i RSA and demonstrates the State's lack of consent to be sued in federal court for violations of the state law.

Furthermore, nothing in HAR § 17–402–17(j) provides consent "by the most express language" for a waiver of the State's sovereign immunity to suit in federal court for a violation of the state law. *See Atascadero*, 473 U.S. at 239, 105 S.Ct. 3142. It cannot reasonably be said that the text of the Hawai'i RSA and its attendant regulations leaves "no room for any other reasonable construction" than that the State has waived its sovereign immunity. *See id.*

In sum, applying established canons of construction, HAR § 17–402–17(j) allows aggrieved vendors the discretion to seek arbitration before the Secretary at their own behest without abrogating the State's sovereign immunity from suit in federal court. The majority's conception of the rule is not consistent with such canons. The majority ordains consent by the State to be sued in federal court for violations of the Hawai'i RSA, despite the fact that the word(s) "appeal," "federal court" or "waiver of immunity" do not appear in the language of HAR § 17–402–17(j).[2] This interpretation misapprehends both what is present in and what is absent from the agency rules.

In any event, HAR § 17–402–17(j) could not waive sovereign immunity. Only the state legislature has the authority to waive a state's Eleventh Amendment immunity. *See Atascadero*, 473 U.S. at 234, 105 S.Ct. 3142 (holding that state may waive sovereign immunity "by a state statute or constitutional provision" if the provision explicitly specifies state's intention to subject itself to suit in federal court). The only exception is where the legislature *expressly delegates* this authority to an administrative agency. *See The Ninth Ave. Remedial Group v. Allis–Chalmers Corp.*, 962 F.Supp. 131, 134 (D.Ind. 1997) (legislature may expressly delegate the authority to waive immunity).

Nothing, however, in the Hawai'i RSA can be read as expressly delegating to the DHS the authority to waive the State's immunity. The DHS is given only the power to "adopt rules in accordance with chapter 91," and there is nothing in chapter 91 allowing a state agency to waive sovereign immunity on behalf of the State. On the contrary, chapter 91 expressly provides that judicial review of contested cases shall take place in the state courts.[3] *See* HRS §§ 91–14(a) and (b) (1993).

### D. *The Hawai'i Legislature Has Explicitly Waived the State's Sovereign Immunity to Suit in State Court for a Violation of the Hawai'i RSA*

For the foregoing reasons, the legislature has not waived the State's sovereign immunity to a state law claim under the Hawai'i RSA being filed in federal court. Therefore, contrary to the majority's holding, there is no legal doctrine that would have allowed the Plaintiffs' claim to have been originally brought in federal court.

On the other hand, Hawaii's legislature has explicitly waived the State's sovereign immunity to suit in state court for a violation of the Hawai'i RSA. HRS § 661–1 (1993) provides as follows:

> The several circuit courts of the State … shall … have original jurisdiction to hear and determine the following matters
>
> …
>
> (1) All claims against the State founded upon any statute of the State[.]

Section 661–1 clearly and expressly waives the State's sovereign immunity and allows the State to be sued for violations of its statutes. The statute also expressly vests jurisdiction for those claims in the circuit courts of the state.

---

**2.** If § 17–402–17(j) could reasonably be read as requiring appellate review in federal courts, such a requirement would be contrary to state law and well established principles of agency law. *See infra* Part IV.

**3.** *See infra* Part V(B) for further discussion of the legislature's mandate that rules be adopted in accordance with chapter 91.

The State's consent to being sued under HRS § 661–1, however, "does not extend consent to suits in federal courts." *Office of Hawaiian Affairs v. Dep't of Educ.*, 951 F.Supp. 1484, 1491 (D.Haw.1996); *see also Price v. Hawaii*, 921 F.2d 950, 958 (9th Cir. 1990) ("[T]hat the State has consented to being sued in its own courts ... does not waive its Eleventh Amendment immunity."). In fact, Hawaii's legislature has made it clear that HRS § 661–1 does not extend jurisdiction to the federal courts:

> [T]he intent of the legislature in amending section 661–1 and 662–3, Hawaii Revised Statutes, in 1978 to extend jurisdiction to district courts in tort actions on claims against the State and certain other claims against the State, was originally and is now to extend jurisdiction for such actions and claims against the State to state district courts, and *not to extend jurisdiction for such actions and claims to federal district courts.*

1984 Haw. Sess. L. Act 135, § 1 at 258 (emphasis added).

That the State may waive its sovereign immunity in its own courts while still retaining its Eleventh Amendment immunity reflects the important principle that "[a] State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst*, 465 U.S. at 99, 104 S.Ct. 900 (emphases in original).

This principle is of paramount importance to the instant case because while the State has given consent to being sued in state court for violations of its statutes, it has never consented to being sued in federal court for violations of the Hawai'i RSA. Therefore, according to the principles of sovereign immunity inherent in the Eleventh Amendment, the courts of the State of Hawai'i enjoy sole and exclusive jurisdiction to decide this case. The federal courts have no jurisdiction to adjudicate Plaintiffs' claims.

## III. *THE FEDERAL RSA EXPRESSLY LIMITS ITS SCOPE TO FEDERAL PROPERTY OR TO "OTHER PROPERTY" AS SPECIFICALLY DEFINED BY THE CODE OF FEDERAL REGULATIONS*

### A. *The Federal RSA, on its Face, is Clearly Limited to Federal Property and "Other Property"*

Only federal law can provide the underlying basis for jurisdiction in a federal court. The federal RSA explicitly limits its application to "vending facilities on any *Federal* property." 20 U.S.C.A. § 107(a)[4] (emphasis added). "Federal property," in turn, is defined by 20 U.S.C.A. § 107(e).[5] The Code of Federal Regulation (C.F.R.) in 34 C.F.R. § 395.1[6] provides a similar limiting definition of "Federal property." The limitation to federal property is reflected throughout the federal RSA. Section 107(b)(2), for example, provides: "Whenever feasible, one or more vending facilities are [to be] established on all Federal property." Indeed, the *chapter title of all thirteen sections* of the federal RSA is "Vending Facilities for Blind in *Federal* Buildings." (Emphasis added.) The definitions contained in the federal RSA do

---

**4.** 20 U.S.C.A. § 107(a) provides as follows:

> For the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property.

**5.** 20 U.S.C.A. § 107(e)(3) provides as follows:

> "Federal property" means any building, land, or other real property owned, leased, or occupied by any department, agency, or instrumentality of the United States (including the Department of Defense and the United States Postal Service), or any other instrumentality wholly owned by the United States, or by any department or agency of the District of Columbia or any territory or possession of the United States.

**6.** 34 C.F.R. § 395.1(g) provides as follows:

> "Federal property" means any building, land, or other real property owned, leased, or occupied by any department, agency or instrumentality of the United States (including the Department of Defense and the United States Postal Service), or any other instrumentality wholly owned by the United States, or by any department or agency of the District of Columbia or any territory or possession of the United States.

not in any way encompass, as the majority would have it, state and county property.

The majority acknowledges that, on its face, the federal RSA applies only to federal property, but nevertheless concludes that the federal adjudication path must be followed even for disputes involving "non-federal property":

> We fully recognize that the federal RSA ... involves the operation of a "vending facility on *any federal property.*" Thus on its face, it appears that DHS is obligated to comply with the federal adjudication path only with respect to claims relating to its management of vending machines on *federal* property. However, in our view it is the *overall scheme of the federal RSA* that dictates adherence to the federal adjudication path even in those situations involving non-federal property.

Majority op. at 399, 146 P.3d at 114 (emphases in original).

The majority patently violates a "cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, [this court] is not at liberty to look beyond that language for a different meaning." *State v. Haugen,* 104 Hawai'i 71, 76, 85 P.3d 178, 183 (2004); *see Allstate Ins. Co. v. Schmidt,* 104 Hawai'i 261, 265, 88 P.3d 196, 200 (2004) ("Where the language of a statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning."); *Akiba v. Waiolena,* 94 Hawai'i 262, 265, 12 P.3d 362, 365 (App.2000) ("[I]f the statute is clear on its face, we need not resort to other principles of statutory construction in interpreting it."). Here, the federal RSA clearly, unambiguously, and explicitly restricts its application to federal property and "other property" as defined in the C.F.R. Thus, this court need go no further in determining its scope.

### B. *The Legislative History of the Federal RSA Reveals no Intent to Expand the Act to Include Non–Federal Property*

In light of the plain and unambiguous language of the federal RSA, it would be fanciful to conclude that Congress surreptitiously induced the participation of a consenting state with the intended effect of divesting state courts of jurisdiction over state claims involving state property. Plainly, Congress would not override state laws and traditional principles of federalism by extending the reach of the federal RSA to non-federal property without expressly referencing such intent in the text of the federal statute itself or in its legislative history.

In fact, the legislative history of the federal RSA demonstrates that Congress had no such intent. The 93rd Congress generated over sixty pages of committee reports regarding the 1974 amendments of the federal RSA. *See* S.Rep. No. 93–937, 93rd Cong., 2d Sess. (1974); S.Rep. No. 93–1297, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 6373. These two committee reports reference "federal property" and "federal buildings" scores of times.[7] Not a single time, however, do these reports ever state that the adjudication proceedings of the federal act would apply to "non-federal property."

It is also inconceivable that Congress would create such a fundamental change in the law without referencing that change in its ample committee reports. In fact, one committee report explains in detail a comparatively minor 1954 change in the federal RSA that slightly expanded its scope from "federal buildings" to "federal property" so as to include, for example, Army posts. *See* S.Rep. No. 93–937, at 5–7. Given its extensive analysis of this slight expansion of the law's scope, Congress would not have failed to so much as mention a change that would exponentially expand the reach of the RSA to

---

7. *See, e.g.,* S.Rep. No. 93–937, at 3 ("The bill requires that a priority be given to the establishment of blind operated vending facilities *on Federal property*[.]"); *id.* at 10 ("[T]he Randolph–Sheppard program was created to be a *federal program.*"); *id.* at 12 ("The Randolph–Sheppard Act authorizes blind persons licensed by State agencies to operate vending stands *on Federal property* "); *id.* at 14 ("State agencies are urged to cooperate fully with the secretary in implementing the law and regulations and to actively seek out vending opportunities for blind licensees *on all Federal property.*"). (All emphases added.)

include virtually all state and county property.[8]

In 1972, Congress asked the General Accounting Office (GAO) to determine if blind vendors were receiving a preference as the 1954 Amendments required. The GAO's subsequent report "concluded that the program was languishing at the federal level while flourishing at the state level and in the private sector." *Texas State Comm. for the Blind v. United States*, 6 Cl.Ct. 730, 733 (1984). The GAO report "was a major catalyst for enacting the 1974 Amendments." *Id.* at 732.

It is illogical to conclude that in enacting the 1974 amendments Congress intended to interfere with highly successful state programs by bringing them under the control of a poorly performing federal program. On the contrary, and consistent with the GAO report, Congress sought to improve the effectiveness of the federal RSA by making revisions to the law to improve the performance of the federal program. Congress obviously did not intend to expand the federal RSA to include state property.

The 1974 amendments included the finding that, "the potential exists for doubling the number of blind operators on Federal and other property under the Randolph–Sheppard program within the next five years[.]" Pub.L. No. 93–651, § 201, 89 Stat. at 2–7; *see also* S.Rep. No. 93–937, at 13 (amendments can allow for "doubling within five years" of their enactment.) In 1974 there were a total of 3,307 blind vending stands throughout the United States. S.Rep. No. 93–937, at 10. Only 874 of those stands were located on federal property. *Id.* Thus, had Congress intended to bring non-federal properties within the ambit of the federal RSA program, it would have instantaneously nearly quadrupled the size of the federal program. There would have been no need to wait five years to "potential[ly]" double the size of the program.

Congress "urged [SLAs] to cooperate fully with the Secretary in implementing the law and regulations and to actively seek out vending opportunities of blind licensees *on*

*all Federal property.*" *Id.* at 14 (emphasis added). Officials controlling federal property were expressly admonished to "work cooperatively with [federal officials and SLAs] to foster the expansion of the Randolph–Sheppard program to its fullest potential as rapidly as possible." *Id.* Congress also explicitly sought to ensure the "uniform treatment of blind vendor's [sic] by all *Federal* agencies" in order to assure the program's vitality and expansion. *Id.* at 27. Neither SLAs nor any federal officials were asked or told to take any action with regard to vending facilities or opportunities on state or county properties.

The legislative history of the 1974 amendments clearly demonstrates that Congress was unmistakably addressing the resolution of vendor disputes arising from federal, not state, property. This legislative history is in perfect accord with the express language of the federal RSA.

## C. *No Federal or State Case Has Ever Held That the Federal RSA Applied to State and County Property*

Until today, no federal or state court has ever held that a state's participation in the federal RSA divests the courts of that state of jurisdiction over state claims involving state property under a state RSA. Nor has any court ever held that the federal RSA confers jurisdiction upon federal courts for state statutory claims arising from state property. Prior precedent has uniformly described the operation of the federal RSA in precisely the opposite fashion. *See, e.g., Minnesota Dep't of Jobs & Training v. Riley,* 18 F.3d 606, 608 (8th Cir.1994) (the [federal RSA] provides the framework for ... giving blind persons licensed by state agencies priority to operate vending facilities on all *federal property* (citing 20 U.S.C. § 107(a)-(b)) (emphasis added)).

No state decision has ever held that the federal RSA encompasses all state and county property. To the contrary, numerous state courts have exercised subject matter jurisdiction in cases involving blind vendors operating on state or county property. *See*

---

**8.** According to the State's reply brief, at least forty-eight states, the District of Columbia, Puerto Rico, and the Virgin Islands have established licensing agencies under the federal RSA.

*infra* Part VII. Furthermore, no other state court has ever dismissed a case for lack of subject matter jurisdiction over a state RSA claim involving state or county property. With all due respect, no state has held as the majority does, because as indicated above, the majority's construction of the federal RSA has no foundation in the statute's language or legislative history but rests on an erroneous view of both.

D. *The Majority's "Overall Scheme" Analysis is Faulty Under Principles of Statutory Construction*

The majority "fully recognize[s] that the federal RSA ... involves the operation of a 'vending facility on any federal property.'" Majority op. at 399, 146 P.3d at 114. However, in the very same paragraph that this recognition is acknowledged, the majority draws an inconsistent conclusion that "it is the *overall scheme of the federal RSA* that dictates adherence to the federal adjudication path *even in those situations involving non-federal property.*" *Id.* (emphases added).

The majority reaches this conclusion because it extends the definition of "other property," as set forth in the C.F.R., beyond its plain application. Majority op. at 404–05, 146 P.3d at 119–20. Under the federal RSA, "other property" is defined as:

Property which is not federal property and *on which vending machines are established* or operated by the use of any funds derived in whole or in part, directly or indirectly, from the operation of vending facilities on any federal property.

34 C.F.R. § 395.1(n) (emphasis added). Thus, "other property" means that if funds derived from the operation of vending facilities on any federal property are used to establish or operate a blind vendor facility on

9. Such construction would also violate the maxim of expressio unius est exclusio alterius. *See Black's Law Dictionary* 581 (6th ed.1990) (defining "expressio unius est exclusio alterius" as "[w]hen certain ... things are specified in a law, ... an intention to exclude all others from its operation may be inferred"). Here, the intention of the definitional limitation to exclude all others would be nullified by the inclusion of all state and county property.

non-federal property, then the federal RSA applies.

But in the instant case *there is absolutely no evidence in the record* to conclude that the City received funds from federal property and used those funds to establish or operate vending facilities on City property. It is also *undisputed* that the State did not operate vending facilities on City property. Hence, any reliance by the majority on the federal RSA definition of "other property" in 34 C.F.R. § 395.1(n) is without factual basis in the record.

Additionally, the majority's reliance on the "overall scheme of the federal RSA," majority op. at 399, 146 P.3d at 114, contradicts precise definitions in the law itself. "It is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and ... *no clause, sentence, or word shall be construed as superfluous, void, or insignificant* if a construction can be legitimately found which will give force to and preserve all words of the statute." *Coon v. City & County of Honolulu,* 98 Hawai'i 233, 259, 47 P.3d 348, 374 (2002) (emphasis added).

The majority's holding that state courts are without subject matter jurisdiction necessarily requires a conclusion that Hawai'i's state and county properties fall within the definitional parameters of the federal RSA. This construction of the statute would render the limitations within the definitions of "federal property" and "other property" *nugatory,* contrary to the fundamental principle of statutory construction that no part of a statute shall be construed as superfluous or void.[9] *Indeed, under "the entire scheme" interpretation of the majority, "federal property" would include all state and county property in all participating states.*[10]

10. To support its "overall scheme" analysis, the majority quotes from *Delaware Dep't of Health & Soc. Servs. v. U.S. Dep't of Educ.,* 772 F.2d 1123 (3d Cir.1985), for the implication that the federal vending program applies "to both federal and 'other buildings in [the] state.'" Majority op. at 400, 146 P.3d at 115. The statutory language quoted in *Delaware Dep't of Health & Soc. Servs.,* Pub.L. No. 74–732, was repealed over fifty years ago and replaced with the terms "federal proper-

E. *HRS § 347–12.5 Does Not Bring Hawai'i State Property Within the C.F.R.'s Definition of "Other Property"*

The majority also places great reliance upon HRS § 347–12.5 as evidencing the "strong implication that the state and county properties fall within 'other property' because income generated from state and county vending facilities as well as federal facilities are deposited into one central account, from which funds may be used for the benefit of blind vendors in Hawai'i." Majority op. at 404–05, 146 P.3d at 119–20. In other words, the majority contends that the enactment of HRS § 347–12.5 established that all state and county property would fall within the parameters of the federal RSA. Nothing in the legislative history of the statute indicates that the legislature intended any such effect.[11]

Instead, HRS § 347–12.5 merely created a revolving account. Significantly, the income generated from vending machines on state and county properties and the income generated from vending facilities on federal property must still, by law, be kept and distributed to blind vendors *separately.* Under the HAR, income from vending machines on federal property accrues only to blind vendors operating competing vending facilities on federal property.[12] *See* HAR § 17–402–17(n)(1). Likewise, income from vending machines on state property accrues only to blind vendors operating vending facilities on state property.[13] *See* HAR § 17–402–17(n)(2). If income from both state and federal properties was simply comingled into one account without being separately accounted for, it would be

impossible for the DHS to distribute income as required by the HAR.

The rules do not indicate in any fashion, as the majority asserts, that federal funds are used to "provide management services, maintain and replace equipment, and purchase new equipment for vending facilities on nonfederal property." Majority op. at 405, 146 P.3d at 120. Rather, the rules simply outline the acceptable uses of funds collected from vending facilities. They also expressly require that funds generated on federal property and funds generated on state property are to be accounted for, distributed, and utilized separately.

In addition, less than a year prior to the adoption of HRS § 347–12.5, this court decided *Hawaii Blind Vendors.* That case explicitly held that state courts had jurisdiction over claims brought under HRS § 102–14 involving state property. *Id.* at 370–71, 791 P.2d at 1264; *see also infra* Part VI. It would have been anomalous for the legislature to have enacted a fundamental change in state law, superseding the decision in *Hawaii Blind Vendors* and effecting a federal claim for all state and county property, without having indicated such intent in either the text of HRS § 347–12.5 or its committee reports.

But there are even more fundamental flaws with the majority's conclusion. The mingling of income into one account generated from state, county, and federal properties does not satisfy the C.F.R.'s definition of "other property." The definition of "other property" requires the property in question to be property "on which vending machines are *established or operated* by the use of any funds derived in whole or in part" from the

---

ty" and "other property." *See* 68 Stat. 663 (1954).

**11.** *See supra* note 1.

**12.** Section 17–402–17(n)(1) states:

Vending machine income from vending *machines on federal property,* which are in reasonable proximity to and in direct competition with any blind vendor, which has been disbursed to the state licensing agency, or instrumentality of the United States under the vending machine income-sharing provision of the Randolph–Sheppard Vending Stand Act *shall accrue to each blind [sic] federal property* in an amount not to exceed the average net income

of the total number of blind vendors within the State, as determined each fiscal year. . . . (Emphases added.)

**13.** Section 17–402–17(n)(2) states:

Vending machine income *from vending machines on state, city, or county property,* which are in reasonable proximity to and in direct competition with any blind vendor, *shall accrue to each blind vendor operating a vending facility on such property.* The state licensing agency shall retain vending machine income disbursed on all other state, city, or county property. (Emphases added.)

operation of vending facilities on any federal property. 34 C.F.R. § 395.1(n) (emphasis added). Here, the record shows unmistakably that the claims in this case did not involve state or county property where the state licensing agency had established or operated vending machines.

The final flaw with the majority's reliance on HRS § 347–12.5 is that, even if this statute actually had the effect of bringing state and county properties within the federal RSA, it would not affect the litigation in this case. It would only have the effect of allowing a new federal claim for the Plaintiffs herein. Absent explicit divestment of the circuit courts' jurisdiction, *see supra* Part II(D), HRS §§ 102–14 and 661–1 would still allow a state claim to be brought under state law in state courts. That, of course, is what the Plaintiffs did in this case.

### F. The HAR's Inclusion of a Definition of "Other Property" Fails to Support the Majority's Analysis

The majority also argues that, "[i]f we were to accept the dissent's flawed theory that the federal RSA applies to federal property and the Hawai'i RSA applies to state and county property, there would have been no need for the DHS to define the phrase 'other property'." Majority op. at 405, 146 P.3d at 120. The majority fails to recognize that HAR § 17–402–17 contains sections that apply specifically and exclusively to federal property, sections that apply specifically and exclusively to non-federal property, and sections that apply to both. Accordingly, the HAR includes a definition of "other property" in order to distinguish federal property from non-federal property.

The inclusion of this definition, in fact, undermines the majority's argument as it demonstrates that the DHS needed to differentiate between sections of the HAR that apply to federal property and those that apply to non-federal property. Indeed, under the majority's line of reasoning, if the federal RSA applies to all properties on which blind vendor facilities are operated, there would have been *no need* for such a distinction.

### IV. THE FEDERAL ADJUDICATION PATH, EVEN IF APPLICABLE, DOES NOT LIMIT JUDICIAL REVIEW TO FEDERAL COURTS

The majority holds that "the overall scheme of the federal RSA dictates adherences to the federal adjudication path even in those situations involving non-federal property." Majority op. at 399, 146 P.3d at 114. This holding is at odds with the weight of authority and is not supported by state or federal law. Even if one accepts this conclusion, however, the Plaintiffs' case is still properly before this court.

As characterized by the majority, the federal adjudication path consists of: "(1) a full evidentiary hearing at the state level before the SLA; (2) an opportunity to appeal the SLA decision to the USDOE for review by an arbitration panel; and, finally, (3) *judicial review* of the USDOE's arbitration panel decision in the *federal courts*[.]" Majority op. at 393, 146 P.3d at 108 (emphasis added). The majority fundamentally misapprehends both the nature and the effect of the federal adjudication path.

### A. The Federal RSA Allows Judicial Review to Take Place in Any "Court of Competent Jurisdiction"

The majority maintains that judicial review under the federal RSA must take place solely and exclusively in the federal courts. Majority op. at 393, 146 P.3d at 108. The federal RSA, however, does not limit judicial review to the federal courts. Instead, the federal RSA states merely that the arbitration decisions of the Secretary are subject to judicial review under the APA. *See* 20 U.S.C. § 107d–2(a). Under the APA, judicial review of agency decisions may take place in any "court of competent jurisdiction." 5 U.S.C. § 703. Judicial review, therefore, may take place in any court with jurisdiction over the claim. This includes state courts.

### B. Federal Case Law Specifically Holds That Jurisdiction in State Courts is Valid Under the Federal RSA

Both the Sixth and Ninth Circuits have held that judicial review of arbitration deci-

sions may take place in *state courts.* In other words, state courts are "courts of competent jurisdiction" for the purposes of the federal RSA. In *Premo,* the court said, "[T]he Act does not specifically designate federal courts as the proper tribunals for the enforcement of such awards. Blind vendors might be able *to bring suit in state court* to enforce arbitration awards." 119 F.3d at 770 (emphasis added). Similarly, the Sixth Circuit, in *Tenn. Dep't of Human Servs.,* said of judicial review of a USDOE arbitration award, "A suit on the judgment *in state court* also is a possibility[.]" 979 F.2d at 1169 n. 4 (emphasis added).

The Sixth and Ninth Circuits both caution that suits in state court to enforce arbitration awards under the federal RSA may bring into play state doctrines of immunity. *Premo,* 119 F.3d at 770, *Tenn. Dep't of Human Servs.,* 979 F.2d at 1169 n. 4. In the instant case, however, there is no issue of state immunity from suit in the state courts. As discussed in Part II(D), the State has waived its sovereign immunity to suit for alleged violations of state law under HRS § 661–1, which vests jurisdiction for such a suit in the circuit courts of our state. Therefore, the circuit courts of this state are a proper com-

ponent of the federal adjudication path as outlined by the federal RSA.

C. *The RSA Statutes of Several States Allow for Judicial Review of Blind Vendors' Claims to Take Place in State Courts*

The Randolph–Sheppard Acts of Colorado, Kentucky, and Ohio explicitly provide that blind vendors may seek judicial review in state court if they are dissatisfied with the results of a full evidentiary hearing conducted before the SLA. These states allow aggrieved vendors to seek judicial review *as an alternative to applying for arbitration before the Secretary.*[14] *See* 12 Colo.Code Regs. § 2513–1(9.411.2) (2006); 782 Ky. Admin. Regs 1:010 § 7(2) and (3) (2006); Ohio Admin. Code 3304:1–21–13 (2005).

Other states, in their Randolph–Sheppard Acts, also deviate from the federal adjudication path as conceived by the majority. The California RSA, for instance, mandates state-controlled arbitration procedures in certain situations involving state property.[15] *See* Cal.Code Regs. tit. 9 § 7216 (2005). Ohio's RSA even more explicitly distinguishes between adjudication procedures for state and federal property by expressly providing that agency decisions involving state property may be directly appealed in state court.[16]

**14.** The relevant provisions of the Colorado regulations read:
> 5. If a blind operator is dissatisfied with the decision rendered after a full evidentiary hearing, he or she may request ... that an arbitration panel be convened by filing a complaint with the Secretary of the Department of Education.
> 6. *If a blind operator is dissatisfied with the decision rendered after a full evidentiary hearing, he or she may also apply for a judicial review by the filing of an action for review in the appropriate State District Court*[.]

12 Colo.Code Regs. § 2513–1(9.411.2) (2006) (emphasis added).

The relevant provision of the Kentucky regulations reads:
> (c) A vendor who is dissatisfied with the final agency decision entered in the evidentiary hearing may seek judicial review in accordance with the provisions of KRS Chapter 13B.

782 Ky. Admin. Regs 1:010 § 7(2) (2006) (emphasis added).

The relevant provision of the Ohio regulations reads:
> (n) The licensee or applicant receiving the order shall also receive a statement that the

order may be appealed in accordance with section 119.12 of the Revised Code. The licensee shall also be informed that a complaint may be filed as provided by section 107d of Chapter 6A of Title XX of the U.S.C.

Ohio Admin. Code 3304:1–21–13 (2005).

**15.** The California RSA provides in relevant part:
> (d) In the event the Director determines that any Federal agency having control of Federal property fails to comply with the applicable provisions of law and regulations and after all informal attempts to resolve the issues have failed, the Director may file a complaint with the Secretary, who may convene an arbitration panel. *If the failure to comply relates to State property,* the Director shall establish an arbitration panel, in accordance with Section 19627, Welfare and Institutions Code, to arbitrate the dispute.

Cal.Code Regs. tit. 9 § 7216 (2005).

**16.** The relevant portion of the Ohio code provides that:
> If a dispute concerning the establishment of a suitable vending facility arises or if the bureau

Such provisions directly undermine the majority's assertion that "the overall scheme of the federal RSA ... dictates adherence to the federal adjudication path even in those situations involving non-federal property." Majority op. at 393, 146 P.3d at 114.

In order "to gain access to federal properties for their blind vendors to operate, [participating states] must submit a state vending facility plan that conforms with the requirements of the federal RSA and its regulations." Majority op. at 393, 146 P.3d at 114. Section 395.4 of Title 34 of the C.F.R. mandates that all rules promulgated by an SLA must have been approved by the Secretary as part of the SLA application process and must be adequate to assure the effective conduct of the State's vending facility program.

Pursuant to this regulation, the Secretary must have reviewed and approved the sections of the Colorado, Kentucky, California, and Ohio regulations allowing for judicial review in state court in lieu of arbitration before the Secretary. The only logical conclusion, therefore, is that state court review of a disputed evidentiary hearing is acceptable under the federal RSA as interpreted by the USDOE. This judicial review may take place prior to, or in place of, arbitration before the Secretary.

The majority's characterization of the federal adjudication path neither accounts for nor allows for any of these various state-law permutations of allowable grievance procedures. If the majority's understanding of the federal RSA is correct, all such provisions would be rendered invalid despite the fact that there is no indication that any of these provisions has ever been challenged. Clearly, the majority's narrow conception of

the adjudication procedures allowed under the federal RSA is incorrect. As the foregoing indicates, the federal RSA does not supersede state court jurisdiction of claims brought under state statutes.

## V. CONFERRING JURISDICTION OF STATE CLAIMS TO FEDERAL COURTS WOULD VIOLATE HAWAI'I LAW AND WELL ESTABLISHED PRINCIPLES OF AGENCY LAW

Neither HRS § 102–14 nor HRS § 347–12.5 can be read as delegating to the DHS the authority to divest the circuit courts of their jurisdiction over claims involving state law. Nevertheless, the majority asserts that HRS § 347–5 has delegated such authority to the DHS. Majority op. at 404–05, 146 P.3d at 119–20 n. 21. Section 347–5 reads as follows:

> The [DHS] may, as the agency of the State for the assistance of blind or visually handicapped persons, do all things which will enable the State and the blind and the visually handicapped in the State to have the benefits of all federal laws for the benefit of blind and visually handicapped persons.

The majority's conclusion is flawed for three reasons: (1) the federal RSA does not require states to follow the federal adjudication path for disputes involving vending operations on state property;[17] (2) such a delegation by the legislature conflicts with the nondelegation doctrine adopted in this state; and (3) any divestment of jurisdiction by the DHS contravenes the legislature's express dictate that the DHS "adopt rules in accordance with chapter 91, necessary for the implementation of this section." HRS § 102–14(b).

---

of services for the visually impaired determines that a *department, agency, or governmental unit in control of governmental property* has not complied with [the Ohio RSA], an administrative hearing shall be held.... The board's adjudication of the dispute shall be conducted in accordance with Chapter 119 of the Revised Code, and any order issued by the board shall be binding on both parties. An order issued by a board constituted under this section may be appealed in accordance with the procedure specified in section 119.12 of the Revised Code.

Ohio Rev.Code Ann. § 3304.32 (LexisNexis 2006). Ohio Rev.Code Ann. § 3304.28 defines "governmental property" as "any real property, building, or facility owned, leased, or rented by the state...."

**17.** *See supra* Part II. As previously discussed, Eleventh Amendment considerations and the language of the federal RSA would also preclude federal court jurisdiction over a state law RSA claim.

A. *Under the Hawai'i Constitution, Only the Legislature is Empowered to Establish Subject Matter Jurisdiction for Hawai'i Circuit Courts*

Under the legislative power granted to it by article III, section 1 of the Hawai'i Constitution, "the legislature has the power to establish the subject matter jurisdiction of our state court system.[18] The legislature has utilized such power by enacting HRS § 603–21.5." *Sherman v. Sawyer*, 63 Haw. 55, 57, 621 P.2d 346, 348 (1980).

> HRS § 603–21.5 gives the circuit court subject matter jurisdiction over civil actions and proceedings. *Thus, the circuit court has jurisdiction over all civil causes of action unless precluded by the State Constitution or by statute.*

*Id.* at 57, 621 P.2d at 348–49 (emphasis added). HRS § 661–1 gives the circuit courts jurisdiction over "[a]ll claims against the State founded upon any statute of the State." Thus, it is clear that, absent express legislative action to the contrary, the circuit courts have jurisdiction over the Plaintiffs' claim. Nothing in the legislative history of the Hawai'i RSA indicates that the legislature intended to divest the circuit courts of that jurisdiction.[19]

There are grave doubts, moreover, about whether the legislature has the power to delegate the authority to divest the circuit courts of jurisdiction over Plaintiffs' claims. Hawai'i has adopted the non-delegation doctrine as part of its constitutional law. *In re*

*Kauai Elec. Div.*, 60 Haw. 166, 181, 590 P.2d 524, 535 (1978). Under this doctrine, the legislature "is not permitted to abdicate or to transfer to others the essential legislative functions" with which it has been vested by constitutional authority. *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). The Hawai'i Constitution endows the legislature with the authority to establish subject matter jurisdiction. *Sawyer*, 63 Haw. at 57, 621 P.2d at 348. It is implausible that the authority to establish or divest jurisdiction is not an "essential legislative function," *Nat'l Cable Television Ass'n*, 415 U.S. at 342, 94 S.Ct. 1146, that the legislature would be precluded from delegating to an administrative agency.

While neither the U.S. Supreme Court nor this court has specifically addressed the question of whether agency regulations may divest courts of jurisdiction granted to them by the legislature, several federal courts have held that they may not. *See Miller v. FCC*, 66 F.3d 1140, 1144 (11th Cir.1995) ("It is axiomatic that Congress ... could not delegate the power to any agency to oust state courts and federal district courts of subject matter jurisdiction[.]"); *United States v. Mitchell*, 18 F.3d 1355, 1360 n. 7 (7th Cir. 1994) (questioning whether the Constitution "would permit Congress to delegate such a core legislative function as its control over federal court jurisdiction to any agency or commission").

**18.** Article VI, section 1 of the Hawai'i Constitution provides in relevant part that, "[t]he several courts shall have original and appellate jurisdiction as provided by law."

**19.** *See* Hse. Stand. Comm. Rep. No. 431, in 1981 House Journal, at 1117–18; Hse. Stand. Comm. Rep. No. 724, in 1981 House Journal, at 1240; Sen. Stand. Comm. Rep. No. 668, in 1981 Senate Journal, at 1200–01; Sen. Stand. Comm. Rep. No. 885, in 1981 Senate Journal, at 1295; Hse. Conf. Comm. Rep. No. 45, in 1981 House Journal, at 918; Sen. Conf. Comm. Rep. No. 47, in 1981 Senate Journal, at 927–28; Sen. Stand. Comm. Rep. No. 253, in 1987 Senate Journal, at 998–99; Sen. Stand. Comm. Rep. No. 580, in 1987 Senate Journal, at 1135; Hse. Stand. Comm. Rep. No. 912, in 1987 House Journal, at 1533–34; Hse. Stand. Comm. Rep. No. 1071, in 1987 House Journal, at 1619; Sen. Stand. Comm. Rep. No. 955, in 1993 Senate Journal, at 1123; Sen. Stand. Comm. Rep. No. 1178, in 1993 Senate Journal, at 1199; Sen. Conf. Comm. Rep. No. 140, in 1993 Senate Journal, at 803; Hse. Stand. Comm. Rep. No. 388, in 1993 House Journal, at 1125; Hse. Stand. Comm. Rep. No. 713, in 1993 House Journal, at 1267; Sen. Stand. Comm. Rep. No. 2717, in 1994 Senate Journal, at 1083–84; Sen. Stand. Comm. Rep. No. 2832, in 1994 Senate Journal, at 1121; Hse. Stand. Comm. Rep. No. 319–94, in 1994 House Journal, at 980; Hse. Stand. Comm. Rep. No. 815–94, in 1994 House Journal, at 1187; Sen. Stand. Comm. Rep. No. 2362, in 1996 Senate Journal, at 1118–19; Sen. Stand. Comm. Rep. No. 2739, in 1996 Senate Journal, at 1274–75; Hse. Stand. Comm. Rep. No. 356–96, in 1996 House Journal, at 1171–72; Hse. Stand. Comm. Rep. No. 639–96, in 1996 House Journal, at 1171–72; Hse. Conf. Comm. Rep. No. 121, in 1996 House Journal, at 1019–20.

The most logical and compelling position for this court to take would be for it to hold that the legislature lacks the constitutional authority to delegate to an administrative agency the authority to establish subject matter jurisdiction. Thus, even if the legislature did intend to delegate such authority to the DHS, DHS would be unable to divest the circuit courts of jurisdiction over the Plaintiffs' claims by virtue of constitutional law.

B. *Any Agency Rule Establishing Jurisdiction in Federal Court Would be Ultra Vires and Invalid*

Even if this court is unwilling to declare that agency rules may not divest state courts of statutorily-granted jurisdiction, nevertheless, the DHS lacked the authority to do so under the Hawai'i RSA. The majority asserts that HAR § 17–402–17(j) imports the federal adjudication path into state law thereby divesting state courts of jurisdiction to hear claims under the Hawai'i RSA. Majority op. at 405–06, 146 P.3d at 120–21. Assuming, *arguendo,* that this is the actual intent of HAR § 17–402–17(j), such application of the rule would violate state law and well-established principles of agency law. The legislature, in HRS § 102–14(b), mandated that the DHS adopt rules in accordance with HRS chapter 91. Therefore, any rule adopted by the DHS that conflicts with chapter 91 must be declared invalid.

"It is axiomatic that agency rule-making authority arises from a legislative grant of power. Absent legislative authority, an agency has no power to act." *Foytik v. Chandler,* 88 Hawai'i 307, 316, 966 P.2d 619, 628 (1998). "[T]he court shall declare [an agency rule] invalid if it finds that it ... *exceeds* the statutory authority of the agency, or was adopted without compliance with statutory rulemaking procedures." HRS § 91–7(b) (1993) (emphasis added). Here, the Hawai'i RSA does not give the DHS the power to confer the circuit court's jurisdiction on the federal district courts. Thus, if HAR § 17–402–17(j) attempts to divest the state courts of their jurisdiction, it is invalid.

There is nothing in HRS § 102–14 that indicates the legislature delegated to the DHS the authority to divest the circuit courts of subject matter jurisdiction for a claim filed under the Hawai'i RSA. Indeed, in HRS § 102–14(b), the legislature required the DHS to "adopt rules in accordance with [c]hapter 91, necessary for the implementation of this section." *See also* HRS § 102–14(d).

Chapter 91 specifically includes a provision that allows a claimant to appeal an adverse ruling by an agency to the circuit court. *See* HRS § 91–14. Thus, the legislature expressly provided that subject matter jurisdiction over a claim under the Hawai'i RSA by an aggrieved claimant would be in state circuit court. Nothing in the legislative history of the statute indicates that the legislature intended otherwise.[20]

When the legislature authorized the DHS to promulgate rules, it could not delegate to the DHS the power to establish a rule contrary to its enabling law. "[A]n administrative rule cannot contradict or conflict with a statute it attempts to implement." *Hyatt Corp. v. Honolulu Liquor Comm'n,* 69 Haw. 238, 241, 738 P.2d 1205, 1206–07 (1987). Thus, the DHS was vested with the power to carry into effect the legislative will as expressed in the statute. Part of that express will was that regulations adopted by the DHS be in accord with HRS chapter 91. The legislature did not limit this mandate to select portions of chapter 91. Hence, any rule adopted by the DHS that contradicts the provisions of chapter 91 is invalid because it conflicts with the explicit language of HRS § 102–14(b). *Id.*

Moreover, "the legislature is presumed to know the law when enacting statutes[.]" *Agustin v. Dan Ostrow Constr. Co.,* 64 Haw. 80, 83, 636 P.2d 1348, 1351 (1981). Thus, the legislature, in specifically referencing chapter 91, must be presumed to have been aware that chapter 91 contains no provision giving a state agency the power to divest the circuit courts of jurisdiction. The legislature must also have been cognizant of HRS § 91–14(a), which provides that "[a]ny person aggrieved by a final decision and order in a contested case ... *is entitled to judicial review thereof*

---

20. *See supra* note 18.

*under this chapter.*" (Emphasis added.) In turn, HRS § 91–14(b) provides that judicial review shall take place in the circuit court.

The legislature mandated in HRS § 102–14(b) that rules were to be adopted in accordance with chapter 91. Chapter 91 specifically provides for judicial relief in the "circuit court" for persons aggrieved by an agency declaratory ruling or a decision in a contested case. *See* HRS § 91–7(a). The legislature has, therefore, vested jurisdiction in the circuit court for a claim arising under the Hawaiʻi RSA. Any contention that HAR § 17–402–17 divests the circuit court of that jurisdiction is in direct conflict with the plain language of the statute.

The majority argues, however, that the provisions of HRS chapter 91 can be divided into separate rule-making and adjudicatory provisions. Majority op. at 403–04, 146 P.3d at 118–19. The majority then asserts that, "had the legislature intended that the adjudicatory provisions of [c]hapter 91 be followed, it would have expressly indicated such intent. . . ." Majority op. at 404, 146 P.3d at 119. It is, however, a cardinal rule of statutory interpretation that:

> [T]he starting point in statutory construction is to determine the legislative intent from the language of the statute itself. Indeed, absent any constitutional obstacles in applying the law, this court's chief duty is to ascertain and give effect to the legislature's intention to the fullest degree, which is obtained primarily from language contained in the statute itself. When a law is enacted, a presumption exists that the words in the statute express the intent of the legislature.

*Morgan v. Planning Dep't. County of Kauaʻi,* 104 Hawaiʻi 173, 185, 86 P.3d 982, 994 (2004) (citations, internal quotation marks, and brackets omitted).

Also, "[t]he words of a statute are to be generally understood in their most common, general, or popular definition." *Singleton v. Liquor Comm'n, County of Hawaiʻi,* 111 Hawaiʻi 234, 243, 140 P.3d 1014, 1023 (2006) (citing HRS § 1–14). "Where a term is not statutorily defined [, a court] may rely upon

extrinsic aids to determine such intent. Legal and lay dictionaries are extrinsic aids which may be helpful in discerning the meaning of statutory terms." *Id.* at 243–44, 140 P.3d at 1023–24.

"Accordance" is defined as "agreement; conformity." *Random House Webster's Unabridged Dictionary* 12 (2d ed.1998). The legislature's mandate in HRS § 102–14(b) that rules be adopted "in *accordance* with [c]hapter 91," (emphasis added), must, therefore, be read as requiring that the rules adopted agree or conform with chapter 91. The legislature did not distinguish in HRS § 102–14(b) between the rule-making and the adjudicatory provisions of the chapter. Nor did the legislature state that the rules should be adopted in accordance with only the rule-making provisions of chapter 91 as the majority proposes. And, nothing in the legislative history of HRS § 102–14 indicates that the legislature intended to limit the scope of its mandate.[21] Instead, on its face, the statute directs the DHS to adopt rules that agree or conform to chapter 91, which can only reasonably be construed as referring to the entire chapter, including those sections establishing adjudicatory procedures.

Nonetheless, the majority speculates that the legislature did not mean what it expressly said, but intended something different, something not stated in the statute itself. The majority lists a number of statutes where the legislature was silent as to the adoption of chapter 91's adjudicatory provisions. Majority op. at 404, 146 P.3d at 119. The majority then asserts that this silence is to be read as meaning that "the agency has the discretion to decide whether to adopt the adjudicatory provisions of HRS chapter 91 when promulgating its administrative rules." *Id.* To the contrary, however, in each of the listed examples the administrative agency established rules in conformity with both the rule-making and the adjudicatory provisions of chapter 91. *See* Hawaiian Homes Commission Act § 222 (Supp.2005); HAR § 10–5–32; HRS § 448B–3(2) (Supp.2005); HAR § 11–79–13f.

---

21. *See supra* note 18.

Finally, the majority's argument presumes that the legislature's failure to expressly mandate that the DHS adopt the adjudicatory provisions of chapter 91 automatically renders those provisions inapplicable to the Hawai'i RSA. This is simply not the case. The adjudicatory provisions of chapter 91 do not depend on the adoption of agency rules to become operative. Rather, chapter 91 expressly provides the jurisdictional route to the circuit court following a final agency decision. *See* HRS § 91–14(a). No "adjudicatory rule" was required to be adopted in order to enable an aggrieved party to exercise its statutory right to appeal to the circuit court pursuant to HRS § 91–14(a).

Indeed, if the majority's understanding of the relationship between chapter 91, HRS § 102–14, and HAR § 17–402–17(j) were correct, numerous state agencies would have the blanket power to eliminate an aggrieved person's right to appeal an adverse final decision to the circuit court simply by repealing or amending their rules. Additionally, the rules adopted by the DHS pursuant to HRS § 102–14(b) would not be subject to challenge by an aggrieved person. *See* HRS § 91–7. A statutory interpretation that eliminates the ability to challenge in state court a state agency rule adopted pursuant to state law "produces an absurd [and] unjust result." *In re Wai'ola O Moloka'i*, 103 Hawai'i 401, 425, 83 P.3d 664, 668 (2004).

The plain language and legislative history of HRS § 102–14(b) neither leads to nor supports such a result. Any contention that state courts have no jurisdiction with respect to HRS § 102–14(b) is belied by chapter 91 and by fundamental principles of statutory construction.

VI. *THE MAJORITY ERRONEOUSLY OVERRULES A HAWAI'I SUPREME COURT DECISION THAT HAD EXPRESSLY HELD THAT HAWAI'I COURTS HAVE JURISDICTION OVER A STATE RSA CLAIM*

As in this case, *Hawaii Blind Vendors* involved state claims brought under the Hawai'i RSA, HRS § 102–14. In *Hawaii Blind Vendors*, this court ruled that state courts have jurisdiction over state RSA claims.

That decision is today overruled on the grounds that "subject matter jurisdiction was never raised," and, therefore, the "court was not given the opportunity to examine the overall federal scheme and its relationship to the Hawai'i RSA." Majority op. at 409, 146 P.3d at 124. That, however, cannot be correct.

In *Hawaii Blind Vendors*, Maka'ala, a non-profit corporation that gave employment preference to handicapped persons, leased airport space for a retail concession. 71 Haw. at 370, 791 P.2d at 1263–64. The DHS renewed Maka'ala's airport lease without providing notice of the vacancy or an opportunity to apply for the vacancy to blind or visually impaired vendors. *Id.* The beneficiaries of the blind vendor program brought an action in the circuit court of the first circuit claiming violations of the substantive and procedural law governing the priority program. *Id.* at 368, 791 P.2d at 1263. The DHS contended that the beneficiaries were required to exclusively bring their action through a DHS administrative hearing and could not bring an original action in the circuit court for injunctive and declaratory relief. *Id.* at 370–71, 791 P.2d at 1264. The circuit court granted summary judgment against the beneficiaries and they appealed. *Id.* at 368, 791 P.2d at 1263.

This court concluded that it was not necessary to resolve the question of whether the beneficiaries could bring an original action in the circuit court of the first circuit for the relief sought, and stated as follows:

> [W]e need not decide this issue. Under the doctrine of primary jurisdiction, *when a court and agency have concurrent original jurisdiction to decide issues* which have been placed within the special competence of an administrative agency, the judicial process is suspended pending referral of such issues to the administrative body for its views. Thus, *the DHS agency process*, if available, is the appropriate forum *for an initial determination of the issues* raised in this case.

*Id.* at 371, 791 P.2d at 1264 (emphasis added) (internal citation omitted). Accordingly, this court found that the circuit court had concur-

rent original jurisdiction with the DHS to resolve the action brought under HRS § 102–14 and HAR § 17–402–17. *Id.* Based upon the conclusion of "concurrent original jurisdiction to decide issues" with the DHS, the case was not dismissed; instead it was duly remanded to the DHS for a full and fair agency hearing "for an *initial* determination of the issues raised in the case."[22] *Id.* (emphasis added). The case was remanded for an "initial determination" precisely because following the agency decision, the circuit court would have had jurisdiction to consider an appeal from the DHS's decision.

Any contention that this court did not consider subject matter jurisdiction is belied by this court's holding that the circuit court had concurrent jurisdiction to decide the case. "Concurrent jurisdiction" is defined as follows:

> The jurisdiction of several different tribunals, *each authorized to deal with the same subject-matter* at the choice of the suitor. Authority shared by two or more legislative, judicial, or administrative officers or bodies to deal with the same subject matter.

*Black's Law Dictionary* 291 (6th ed.1990) (emphasis added). "Subject matter jurisdiction" is defined as follows:

> A *court's power to hear and determine cases* of the general class or category to which proceedings in question belong; the power to deal with the general subject involved in the action.

*Id.* at 1425 (emphasis added).

This court's conclusion that the circuit court had concurrent jurisdiction to decide the issues raised in *Hawaii Blind Vendors* was unequivocally a determination of subject matter jurisdiction over the case. In order to conclude concurrent jurisdiction, the court in *Hawaii Blind Vendors* had to have determined the question of subject matter jurisdiction and decided that the circuit court had jurisdiction over the statutory claim.

Furthermore, in order to dismiss the instant case for lack of subject matter jurisdiction, the majority is compelled to conclude

that Hawaii's legislature intended to confer state jurisdiction over state claims to federal court. However, if this had been the legislative intent, then the legislature would have acted in response to this court's decision in *Hawaii Blind Vendors,* as HRS § 102–14 was cited as the authorizing statute for HAR § 17–402–17, which was the basis for a state administrative hearing. *Cf. Gorospe v. Matsui,* 72 Haw. 377, 381, 819 P.2d 80, 82 (1991) (where the legislature fails to act in response to our statutory interpretation, the consequence is that the statutory interpretation of the court must be considered to have the tacit approval of the legislature). Nothing has been enacted into law since the decision in *Hawaii Blind Vendors* that indicates the legislature intended to supersede the decision in that case or that the case was wrongly decided. Nevertheless, today the majority overrules that decision based upon an erroneous construction of the federal RSA as set forth herein.

VII. *NO STATE COURT HAS EVER DISMISSED A CASE FOR LACK OF SUBJECT MATTER JURISDICTION OVER A STATE RSA CLAIM, AND CONVERSELY, NUMEROUS STATE APPELLATE COURTS HAVE EXERCISED JURISDICTION IN SUCH CASES*

It bears repeating that only federal law can provide the basis for federal jurisdiction. As mentioned before, in the majority's view, it is the "entire scheme" of the federal RSA that divests state courts of jurisdiction over state claims involving state property. The consequence of this ruling is that since nearly all states participate in the federal RSA program, the federal RSA governs not only all federal property, but virtually all state and county property as well. This also means that no state court would have jurisdiction to decide a state RSA claim based on state law.

As noted, no state court has ever so held. Indeed, it appears that no state appellate court has ever endorsed the proposition that it lacked subject matter jurisdiction to decide

---

**22.** In *Hawaii Blind Vendors,* 71 Haw. at 371–74, 791 P.2d at 1264–66, this court also determined that the ninety day time bar of HAR Rule 17–400–4(2)(G) did not bar the beneficiaries' action.

an issue under a state RSA law. Conversely, numerous state courts have exercised subject matter jurisdiction in cases involving blind vendors operating on state or county property.

Kentucky, like Hawai'i and numerous other states, has enacted a state RSA statute to establish a vending facilities program in state buildings for qualified blind persons. In *Kentucky State Univ. v. Kentucky Dep't for the Blind*, 923 S.W.2d 296 (Ky.App.1996), it was undisputed that Kentucky State University fell within the purview of Kentucky's RSA statute. *Id.* at 297. The Kentucky Court of Appeals upheld the lower court's decision as to the program's right to product and supplier selection but reversed the circuit court's holding regarding a blind vendor's right of first refusal concerning site selection. *Id.* at 300. While the Court of Appeals found federal law "instructive" and turned to it "for guidance," *id.* at 298–99, the court definitively exercised subject matter jurisdiction over the case in rendering its decision.

*Marlar v. State of Arizona*, 136 Ariz. 404, 666 P.2d 504 (Ct.App.1983), involved a food service facility in the State Education Building. Under its state RSA law, Arizona had established a vending facilities program for the blind on state, county, and municipal property. *Id.* at 506 (citing Ariz.Rev.Stat. Ann. § 23–504.A (West 2006)). The plaintiff successfully brought suit in superior court claiming that he had been improperly transferred to another facility without his consent. *Id.* at 508. On appeal, the state agency defendant contended that the superior court lacked jurisdiction to consider plaintiff's complaint because plaintiff failed to join the director of the agency as a party. *Id.* The Arizona Court of Appeals rejected the jurisdictional challenge and ruled that the director was not an indispensable party and affirmed the judgment of the lower court, manifestly exercising subject matter jurisdiction in reaching its decision. *Id.*

*Glanz v. McCray*, 1994 OK CIV APP 109, 881 P.2d 766 (1994), involved vending facilities at the Tulsa County Courthouse. Pursuant to Oklahoma's RSA law, local and state authorities must give priority to the blind to operate vending facilities. *Id.* at 767 (citing Okla. Stat. Ann. § 73 (West 2006)). The district court issued a writ of mandamus in favor of the manager of the vending facilities at the courthouse and the Department of Human Services requiring the sheriff's department to allow the blind vendor program to operate the jail commissary. *Id.* at 767. Among the grounds raised on appeal was that the trial court lacked personal jurisdiction over the sheriff's department. *Id.* The Court of Appeals of Oklahoma ruled that the trial court did not err in denying the various challenges to personal jurisdiction. *Id.* at 767–68. Subject matter jurisdiction was necessarily exercised in order for the appellate court to reach its decision.

Louisiana adopted a state RSA law that required state agencies, board commissions and institutions owning, maintaining or controlling state property to give preference to blind persons in the operation of vending stands. LSA R.S. 46:333. In *Copsey v. Joint Legislative Budget Control Council*, 607 So.2d 841 (La.App.1992), the Court of Appeal of Louisiana held that the lower court erred in granting a writ of mandamus to a blind vendor challenging a lease of space in the state capitol in view of the plaintiff's delay in bringing suit and because injunctive and declaratory relief actions were also brought. *Id.* at 843. The Louisiana appellate court plainly rendered its decision on the merits.

In *Gundy v. Ozier*, 409 So.2d 764 (Ala. 1981), the Alabama Supreme Court construed an Alabama RSA law that gave preference to licensed blind persons in the operation of vending machines on state property. *Id.* at 765 (citing Ala.Code §§ 21–1–40 and – 41 (West 2006)). The dispositive question on appeal was the extent of the preference given in the statute to blind persons. *Id.* at 766. The Alabama Supreme Court decided the issue by determining the legislative intent of the Alabama legislature and finding additional support for its conclusion in federal case law. *Id.* at 766–67.

It is significant that the majority's decision in this case results in the federal court having the sole authority to determine the intent of the Hawai'i legislature regarding the issue

of statutory construction of a Hawai'i law. One impact of the majority's decision is that the Hawai'i Supreme Court would have no authority to determine whether a state law or administrative agency rule concerning the blind vendor program violated our state constitution. This is not an abstract possibility. In *West Virginia v. Casey,* 160 W.Va. 50, 232 S.E.2d 349 (1997), the Supreme Court of Appeals of West Virginia considered a West Virginia statute, W. Va.Code Ann. § 18–10G–3 (West 2006), that provided for rent-free use of state, county, and city property by the West Virginia Society for the Blind and Severely Disabled for purposes of operating food services to enlarge employment opportunities for the disabled. The court held that the statute was an *unconstitutional* grant of the credit of the state to, or in aid of, a private corporation. *Id.* at 352.

No Hawai'i citizen challenging a state statute or state rule as contrary to the Hawai'i Constitution should be compelled to bring a suit in federal court to obtain a ruling on the legality of a Hawai'i statute or rule. Nor should a Hawai'i citizen be placed in the precipitous position of trusting that the federal court will correctly determine constitutionality under Hawai'i law.

The majority may contend that none of the decisions discussed above directly addressed subject matter jurisdiction. It is counterintuitive, however, to conclude that in all of these cases, all of the lower and appellate courts, and all of the parties and counsel overlooked the issue of lack of subject matter jurisdiction. Instead, it is far more likely that lack of subject matter jurisdiction by a state court over a state claim was determined not to be a viable issue by the parties, counsel and the courts in each of these cases.

VIII. *NONE OF THE FEDERAL DECISIONS RELIED UPON BY THE MAJORITY INVOLVE A STATE CLAIM BROUGHT UNDER A STATE RSA LAW AND THEREFORE THESE CASES ARE INAPPOSITE*

The majority relies on four federal cases to demonstrate that its "conclusion is consistent with federal case law, where federal courts have reviewed decisions rendered by an ad hoc arbitration panel convened by the Secretary involving certain states' blind vendors programs." Majority op. at 395, 146 P.3d at 116. None of these cases, however, involved state claims brought under state RSA laws. Instead, they involved *federal* claims brought under the federal RSA where the federal adjudication path was applicable. In each of these cases the resolution of the dispute had potential effects on vendors operating on both state and federal property. It must be noted, moreover, that not a single one of these cases held that a state court would have lacked jurisdiction to adjudicate the dispute. Therefore, these cases provide no authority for determining that a state court lacks jurisdiction over a state RSA claim based on a state law, as the majority contends.

*Smith v. Rhode Island State Servs.,* 581 F.Supp. 566 (D.R.I.1984), involved state rules and regulations adopted by the Rhode Island state licensing agency. Under federal regulations, an application for designation as a state licensing agency must contain a plan outlining the rules and regulations applicable to the blind vendor program that is administered by the state. *Id.* at 568 (citations omitted). The rules and regulations that were the basis of the controversy in *Smith,* involving the method of selection, transfer and promotion of vendors, had been approved by the federal government. *Id.* at 569. Neither a state claim under a state RSA law, nor state court jurisdiction, was at issue in *Smith.*

In *McNabb v. U.S. Dep't of Educ.,* 862 F.2d 681 (8th Cir.1988), the United States Court of Appeals for the Eighth Circuit concluded that a federal arbitration panel could not award a blind vendor retroactive money damages against Arkansas pursuant to the federal RSA, although prospective damages and equitable relief could be awarded. *Id.* at 683–84. In *McNabb,* the blind vendor followed the adjudication path provided for in 20 U.S.C. § 107d–1(a), a federal law. *Id.* at 682–83. The case did not involve a concurrent state court action nor did it reference any state RSA law.

*Delaware Dep't of Health & Soc. Servs.* also involved federal regulations promulgated pursuant to the federal RSA requiring state licensing agencies to establish and maintain policies to govern transfer and promotion of vendors. In compliance with federal regulations, Delaware's rules set forth regulations dealing with the transfer and promotion of blind vendors. 772 F.2d at 1131–32. The application of these regulations in determining whether a particular vendor was the most senior qualified applicant formed the basis of the dispute in the case. *Id.* The applicant vendor prevailed during the arbitration process and was awarded compensatory damages and attorney's fees. *Id.* at 1132. The federal appeals court affirmed the award, reversing the district court's judgment that had vacated the award. *Id.* at 1140. Again, state jurisdiction over a state claim under a state RSA was not involved.

Finally, in *Fillinger v. Cleveland Soc'y for the Blind,* 587 F.2d 336, 337 (6th Cir.1978), the Ohio Rehabilitation Services Commission supervised a blind vending program established pursuant to the federal RSA. In determining that the aggrieved blind vendors were required to exhaust their administrative remedies before seeking review in the district courts, the United States Court of Appeals for the Sixth Circuit interpreted only federal law. *Id.* at 337–38. There was no discussion whatsoever of an Ohio counterpart to the federal RSA, or of federal jurisdiction over a state claim.

In summary, none of the federal cases cited by the majority are relevant to support its conclusion that a state court does not have subject matter jurisdiction over a claim brought under a state RSA law.

IX. *THE ONLY FEDERAL DECISION THAT DISCUSSED WHETHER A STATE'S PARTICIPATION IN THE FEDERAL RSA WOULD CONFER FEDERAL JURISDICTION OVER A STATE CLAIM HAS STRONGLY INDICATED THAT IT WOULD NOT SO CONFER*

The notion that a state's participation in the federal RSA, which requires creation of a state licensing agency and acceptance of the federal adjudication path, would confer federal jurisdiction over state claims involving state property under a state RSA has been, at a minimum, implicitly rejected by one federal court. In *Ramsey,* the United States Court of Appeals for the First Circuit addressed New Hampshire's compliance with the federal RSA's requirement that "priority" be given to blind vendors in operating vending machine operations in rest areas along federally funded interstate highways. 366 F.3d at 4.

The First Circuit noted that the case was governed by two federal statutes, the federal RSA and the Surface Transportation Assistance Act (STAA). *Id.* at 5–7. Under the STAA, a state cannot accept federal highway funds without entering into an agreement with the Secretary of Transportation that includes a promise to comply with a priority system for vending machines operated on the interstate highway system. *Id.* at 7 (citations omitted). Unlike the federal RSA, the STAA specifically includes rights-of-way on state property of the Interstate system. *Id.* at 7 (citing 23 U.S.C. § 111(b)).

The plaintiffs (Blind Vendors) filed an action under 28 U.S.C. § 1331 against several New Hampshire state defendants alleging that New Hampshire was violating 23 U.S.C. § 111(b) of the STAA by failing to give them priority to vending facilities operated through the state licensing agency (SLA). *Id.* at 9. A similar action was also filed in a New Hampshire state court. *Id.* The Blind Vendors requested an injunction requiring that all existing contracts to operate vending facilities be voided and that the state grant the right to operate those facilities to licensed blind vendors. *Id.* The state filed a motion to dismiss arguing that the Blind Vendors had not exhausted their administrative remedies before filing a judicial action and that the Blind Vendors' claims could be more readily resolved in state court. *Id.* at 9–10. The First Circuit noted that in the state's motion, "the state conceded that even if the claim could not go forward in federal court, *the state court proceeding could go forward.*" *Id.* at 10 (emphasis added).

The federal court dismissed the Blind Vendors' claim without prejudice finding that they had failed to exhaust their administrative remedies. *Id.* At the administrative hearing, the state contended that the rest areas were on "state, not federal, property and so are not subject to the [federal RSA]." *Id.* at 11. The Blind Vendors "did not dispute that the [federal RSA] applies only to federal land." *Id.* Instead, the Blind Vendors argued that § 111(b) of the STAA clearly applied to rest areas on both state and federal land. *Id.*

The Blind Vendors prevailed at the administrative hearing, on appeal to the USDOE arbitration panel, and in the federal district court. The First Circuit framed the issue as "whether the vending machines to which Section 111(b) refers are within the vending facility program described in the [federal RSA]." *Id.* at 23. The court concluded that the "vending machines" were within "the vending facility program" based on the plain language of the federal RSA and 23 U.S.C. § 111(b). *Id.*

The First Circuit then added the following significant footnote regarding vending facilities located on state properties:

> *SLAs sometimes operate vending machines outside the [federal RSA] .... Among those functions is the operation of vending machines on state property under the state's "mini"-R-S Act. But, to the extent that SLAs operate those machines, they do so in their general capacity as agencies of the state, not in their capacity as licensing agencies designated under the [federal RSA].*

*Id.* at 23 n. 23 (emphasis added) (internal citations omitted).

Applying the analysis of the *Ramsey* court to the instant case, *the DHS, when administering the operation of vending machines on state property, acts in its general capacity as an agent of the state,* and not in its capacity as a licensing agency designated under the federal RSA. Therefore, federal court juris-

diction under the federal RSA is not implicated in this case.

It is revealing to compare the State of New Hampshire's position in *Ramsey* to the State's position in the instant case. The defendants in *Ramsey* "conceded that even if the claim could not go forward in federal court, the state court proceeding could go forward." [23] *Id.* at 10. Further, all parties in *Ramsey* agreed that the federal RSA did not apply to state property. Moreover, the footnote by the *Ramsey* court plainly indicates its agreement that the operation of vending machines on state property by a SLA is not done in the SLA's capacity as a licensing agency under the federal RSA, and therefore federal jurisdiction does not lie. The majority's holding in this case is in direct conflict with the conclusion of the *Ramsey* court.

## X. *CONCLUSION*

In reaching its decision to dismiss this case for lack of subject matter jurisdiction, I believe, with all due respect, that the majority has made numerous erroneous pronouncements upon the law. These include the following holdings:

(1) The federal RSA applies to virtually all state and county property in the United States, despite explicit language in the statute itself that restricts its scope, its Congressional history to the contrary, and the uniform disagreement of state and federal courts;

(2) Eleventh Amendment immunity may be "implicitly surrendered," despite federal and state precedent that requires waiver to be express, explicit, and unequivocal, thereby setting a very low bar for determining that the State has waived its sovereign immunity;

(3) A claim based on a state law cannot be brought in a state court despite federal preemption not being invoked, meaning federal courts will have exclusive jurisdiction over a state RSA claim, and the sole authority to interpret Hawaii's RSA law, the applicable

**23.** The State in the instant case did not dispute subject matter jurisdiction until after the case had proceeded to verdict, was appealed, the appeal was dismissed for lack of finality of judgment, and the case was remanded to the circuit court. Only then did the State raise the issue of subject matter jurisdiction.

state agency rules, and the Hawai'i Constitution as it relates to issues involving the Hawai'i RSA;

(4) The statutory mandate to "adopt rules in accordance with [c]hapter 91" is construed to mean that an agency can adopt adjudicatory rules or take actions that conflict with specific statutes in chapter 91, allowing numerous state administrative agencies unprecedented discretion in deciding whether to adopt the adjudicatory proceedings of HRS chapter 91 and eroding statutory rights provided to aggrieved claimants by chapter 91; and

(5) Overruling *Hawaii Blind Vendors,* a case that had held there was subject matter jurisdiction to decide a claim under the Hawai'i RSA, on the premise that subject matter jurisdiction was never raised in that case, although this court had specifically concluded in its decision that the circuit court had concurrent jurisdiction with DHS over the claim.

For the reasons stated above, I do not agree with the majority's holding and have great concern for the precedent established by its decision. I would conclude that this court does have subject matter jurisdiction over Plaintiffs' claims under the Hawai'i RSA and reach the merits of the appeals in this case.